[No. 77395-5.   En Banc.]

Argued March 23, 2006.      Decided December 28, 2006.

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES WALTER WEBER, *Petitioner*.

*Susan F. Wilk* (of *Washington Appellate Project*), for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Brian M. Mc-Donald, Deputy,* for respondent.

¶1 FAIRHURST, J. — A jury convicted petitioner Charles Walter Weber of first degree assault and second degree attempted murder stemming from the same shooting incident. Weber argues that the inclusion of his prior juvenile adjudications in his offender score during sentencing violates his due process rights and his right to a jury trial. He also argues that the Court of Appeals erred by vacating his second degree attempted murder conviction rather than his first degree assault conviction as the lesser offense for double jeopardy purposes. Finally, he argues that the prosecuting attorney committed three instances of misconduct requiring reversal of his convictions.

¶2 We hold that prior juvenile adjudications fall under the "prior conviction" exception in *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) and are not facts that a jury must find under *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). We also hold that, in this case, the lesser offense for double jeopardy purposes is the offense that carries the lesser sentence, which was Weber's attempted murder conviction. Finally, we hold that the prosecuting attorney did not commit misconduct that constitutes reversible error. We affirm the Court of Appeals.

## I. FACTUAL AND PROCEDURAL HISTORY

¶3 In the early morning of March 18, 2003, Weber was at a friend's apartment with several people drinking beer. Weber and his friend, Nick Renion, started to argue with Gabriel Manzo-Vasquez (Manzo). During the argument, Weber pulled a gun on Manzo. Manzo escaped the apartment by jumping out of a bedroom window and ran to his vehicle. Weber followed Manzo outside and fired multiple shots at Manzo's vehicle. One of the bullets grazed Manzo's side, causing a slight injury.

¶4 When the police investigated the incident, Manzo told them that a man he knew as "Guero Loco" shot him. Verbatim Report of Proceedings (VRP) (June 17, 2003) at 39;

VRP (June 19, 2003) at 25-26. "Guero Loco" translates as "crazy white guy" in English. VRP (June 17, 2003) at 41. Manzo provided the police with a physical description of Weber, including a description of the distinctive tattoo of "206" on the back of his neck. *Id.* at 39. Manzo identified Weber in a photo montage with 80 percent certainty and stated that he could be only 80 percent certain because he could not see the blacked out tattoo. At trial, Manzo identified Weber as his shooter and confirmed that he had the correct tattoo.

¶5 In a pretrial hearing, the trial court excluded testimony by Detective George Alvarez that he had previously met Weber specifically while investigating a crime involving Weber's brother but did not exclude evidence that the detective had previously met Weber. The trial court also excluded any evidence of gang membership but did not exclude evidence of "any marks that may have been observed by any witness or testimony of any marks that may currently be present on Mr. Webber [sic]." VRP (June 11, 2003) at 10. The State concedes that the prosecuting attorney committed misconduct by eliciting evidence covered by the motions to exclude and by making an improper argument in rebuttal closing argument but argues that the misconduct did not affect the outcome of Weber's trial. Br. of Resp't at 11, 15, 17.

¶6 The prosecuting attorney charged Weber with first degree attempted murder with a firearm, first degree assault with a firearm, first degree unlawful possession of a firearm, and possession of cocaine with intent to manufacture or deliver. Weber pleaded guilty to possession of cocaine with intent to deliver. A jury acquitted Weber of first degree attempted murder and instead found him guilty of second degree attempted murder with a firearm, as well as first degree assault with a firearm and first degree unlawful possession of a firearm.

¶7 At sentencing, the trial court declined to include Weber's prior juvenile adjudication for first degree attempted robbery in his offender score because it had "washed out" under

a previous version of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. VRP (Aug. 8, 2003) at 15; Clerk's Papers (CP) at 171. The trial court also noted that Weber's other juvenile adjudication, for taking a motor vehicle without permission, was only "half a point" and did not factor into his offender score. VRP (Aug. 8, 2003) at 16. The trial court found that Weber's convictions for attempted murder and assault constituted double jeopardy and vacated the assault conviction as the lesser offense.

¶8 Weber appealed his convictions to the Court of Appeals, arguing that three instances of prosecutorial misconduct constituted reversible error. Br. of Appellant at 8-14. The State filed a cross appeal challenging the trial court's decision to vacate Weber's assault conviction as the lesser offense and the trial court's finding that Weber's juvenile attempted robbery adjudication "washed out." Br. of Resp't at 43-51. Weber replied that the inclusion of his prior juvenile adjudications in his offender score would violate his due process rights under the Fifth and Fourteenth Amendments and his right to a jury trial under the Sixth Amendment. Reply Br. of Appellant at 2-12.

¶9 In a partially published opinion, the Court of Appeals held that Weber's prior juvenile adjudication did not wash out and should have been included in his offender score. *State v. Weber*, No. 53911-1-I, slip op. (unpublished portion) at 25 (Wash. Ct. App. June 6, 2005). In so holding, the court concluded that juvenile adjudications fall under the prior conviction exception in *Apprendi* and that Weber's juvenile adjudications were "properly considered to calculate his offender score." *State v. Weber*, 127 Wn. App. 879, 892-93, ¶ 32, 112 P.3d 1287 (2005). The court reversed the trial court and vacated the attempted murder conviction as the lesser offense for double jeopardy purposes and reinstated Weber's assault conviction. *Id.* at 882, ¶ 3. Finally, the court held that although the prosecuting attorney committed misconduct, that misconduct did not constitute reversible error. *Weber*, No. 52911-1-I at 15-22. We granted Weber's subse-

quent petition for review on all three issues. *State v. Weber*, 156 Wn.2d 1010, 132 P.3d 147 (2006).

## II. ISSUES

A. Whether under *Apprendi*'s prior conviction exception a trial court may include prior juvenile adjudications in an offender score calculation.

B. Whether second degree attempted murder or first degree assault is the "lesser" offense for double jeopardy purposes.

C. Whether prosecutorial misconduct caused Weber prejudice requiring reversal of his convictions.

## III. ANALYSIS

A. Whether under *Apprendi*'s prior conviction exception a trial court may include prior juvenile adjudications in an offender score calculation

¶10 Weber argues that the trial court's inclusion of his prior juvenile adjudications in his offender score violates his due process rights under the Fifth and Fourteenth Amendments,[1] and his jury trial rights under the Sixth Amendment[2] to the United States Constitution. In *Apprendi*, the United States Supreme Court held that "[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490 (emphasis added). In *Blakely*, the Court clarified that the relevant "statutory maximum" for *Apprendi* purposes "is the maximum sen-

---

[1] The Fifth Amendment provides, in relevant part, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Fourteenth Amendment provides, in relevant part, that "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

[2] The Sixth Amendment guarantees a criminal defendant the right to "a speedy and public trial, by an impartial jury." U.S. CONST. amend. VI.

tence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 542 U.S. at 303. In other words, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 303-04.

¶11 Inclusion of Weber's juvenile adjudications in his offender score would undeniably increase his maximum sentence above the sentence supported by the jury's verdict. However, under *Apprendi*, only facts "[o]ther than the fact of a prior conviction" that increase a defendant's maximum sentence violate that defendant's constitutional rights. 530 U.S. at 490. Thus, we must consider whether Weber's juvenile adjudications qualify as "prior convictions" under *Apprendi*'s prior conviction exception.

¶12 The United States Supreme Court first carved out an exception for prior convictions in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). The Court held that recidivism is not a fact that a jury must find in order for a defendant's prior conviction to be used to enhance his or her sentence.

> [T]he sentencing factor at issue here—recidivism—is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence. . . . [T]o hold that the Constitution requires that recidivism be deemed an "element" of petitioner's offense would mark an abrupt departure from a longstanding tradition of treating recidivism as "go[ing] to the punishment only."

*Id.* at 243-44 (fourth alteration in original) (citations omitted) (quoting *Graham v. West Virginia*, 224 U.S. 616, 629, 32 S. Ct. 583, 56 L. Ed. 917 (1912)). In *Apprendi*, the Court again recognized an exception for prior convictions based on *Almendarez-Torres* and observed that:

> Both the certainty that procedural safeguards attached to any "fact" of prior conviction, and the reality that Almendarez-Torres did not challenge the accuracy of that "fact" in his case,

mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a "fact" increasing punishment beyond the maximum of the statutory range.

530 U.S. at 488. Thus, the *Apprendi* Court reasoned that when prior convictions are used to increase a defendant's punishment above the statutory maximum sentence, a jury need not find those facts because they already carry sufficient procedural safeguards.

¶13 As in *Almendarez-Torres*, Weber does not challenge the "fact" of his juvenile adjudication, but he does argue that a juvenile adjudication does not carry the same procedural safeguards as a prior conviction.[3] Weber argues that the Supreme Court's decision in *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999), clarifies that the prior conviction exemption in *Almendarez-Torres* was predicated on the right to a jury trial. Because juvenile adjudications do not carry the right to a jury trial, Weber argues that they do not fall under the prior conviction exception. The dissent agrees that *Jones* is the key to understanding *Apprendi's* prior conviction exception because *Jones* explains why "it was permissible, in *Almendarez-Torres v. United States*, to use a prior conviction as a sentencing factor to increase a statutorily mandated maximum punishment." Dissent at 281 (citation omitted).

¶14 The *Jones* Court, after noting the "emphasis on the distinctive significance of recidivism" in *Almendarez-Torres*, stated:

> *One basis for that possible constitutional distinctiveness is not hard to see*: unlike virtually any other consideration used to enlarge the possible penalty for an offense, . . . a prior convic-

---

[3] Weber's juvenile adjudication for attempted first degree robbery was an element of the charge of unlawful possession of a firearm in the first degree, one of his convictions. VRP (June 30, 2003) at 7; CP at 35. Weber stipulated to the existence of this prior adjudication but later argued that it "washed out." CP at 157-58. The Court of Appeals held that the adjudication did not wash out. *Weber*, slip op. (unpublished portion) at 24-25. Weber has never argued that his prior adjudication was invalid.

tion must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees.

526 U.S. at 249 (emphasis added). *Jones* thus advances the guaranties of "fair notice, reasonable doubt, and jury trial" as one possible, not the exclusive, basis for the distinctive constitutional treatment of recidivism. *Id.* The dissent concludes that to fall within *Apprendi*'s prior conviction exception, "a juvenile adjudication *must* have had the same constitutional safeguards in place as in *Jones*, in particular the right to trial by jury and proof beyond a reasonable doubt." Dissent at 282 (emphasis added). However, *Jones* did not authoritatively pronounce that "fair notice, reasonable doubt, and jury trial" represented the minimal procedural safeguards sufficient for the prior conviction exception announced in *Apprendi* the following year.

¶15 The United States Court of Appeals for the Ninth Circuit has held that juvenile adjudications may not be used to enhance a sentence without violating a defendant's constitutional rights.

> Thus, as we read *Jones* and *Apprendi*, the "prior conviction" exception to *Apprendi*'s general rule must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt. Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within *Apprendi*'s "prior conviction" exception.

*United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir. 2001). Other jurisdictions have also held that juvenile adjudications do not fall within *Apprendi*'s prior conviction exception. *See, e.g., State v. Brown*, 03-2788 (La. 7/6/04), 879 So. 2d 1276, 1289 (holding that juvenile adjudications are not convictions for the purposes of the prior conviction exception), *cert. denied*, 543 U.S. 1177 (2005); *State v. Harris*, 339 Or. 157, 172-75, 118 P.3d 236 (2005) (holding that juvenile adjudications are not convictions under Oregon law and

may not be used as sentence enhancement factors unless admitted by the defendant or proved to a jury).

¶16 However, the majority of jurisdictions that have considered this issue have reached the opposite conclusion and held that juvenile adjudications fall under the prior conviction exception. *See, e.g., United States v. Jones*, 332 F.3d 688, 696 (3d Cir. 2003) (juvenile proceedings provide sufficient procedural safeguards to qualify under the prior conviction exception), *cert. denied*, 540 U.S. 1150 (2004); *United States v. Smalley*, 294 F.3d 1030, 1032-33 (8th Cir. 2002) (juvenile adjudications are prior convictions for *Apprendi* purposes); *United States v. Burge*, 407 F.3d 1183, 1190 (11th Cir.) (holding, based on *Jones* and *Smalley*, that juvenile adjudications provide sufficient procedural safeguards to qualify as prior conviction), *cert. denied*, 546 U.S. 981 (2005); *People v. Superior Court*, 113 Cal. App. 4th 817, 834, 7 Cal. Rptr. 3d 74 (2003) (juvenile adjudications may be used as a "strike" for the purposes of a "three strikes" law), *cert. denied sub nom. Andrades v. California*, 543 U.S. 884 (2004); *Nichols v. State*, 910 So. 2d 863, 864-65 (Fla. Dist. Ct. App. 2005) (juvenile adjudications may be included in a defendant's "scoresheet" unless he or she can prove they are "constitutionally infirm"); *State v. Hitt*, 273 Kan. 224, 236, 42 P.3d 732 (2002) (juvenile adjudications "are included within the historical cloak of recidivism"); *Ryle v. State*, 842 N.E.2d 320 (Ind. 2005) (juvenile adjudications may be used to enhance a sentence), *cert. denied*, 127 S. Ct. 90 (2006).

¶17 Weber argues that our decision in *State v. Hughes*, 154 Wn.2d 118, 110 P.3d 192 (2005), *overruled on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006), dictates that this court recognize that the prior conviction exception is based only on convictions found by a jury. In *Hughes*, we observed that the reason for the prior conviction exception "likely is because of the objective nature and the inherent protections associated with the existence of prior convictions—the defendant already had the facts regarding his prior conviction found by

a jury beyond a reasonable doubt." *Id.* at 137 n.5. However, as in *Apprendi*, the *Hughes* court did not specifically consider whether the protections associated with juvenile adjudications would also qualify them under the prior conviction exception.

¶18 As the United States Court of Appeals for the Eighth Circuit noted in *Smalley*, *Apprendi* recognized "that prior convictions are excluded from the general rule because of the 'certainty that procedural safeguards'" afford them. *Smalley*, 294 F.3d at 1032 (quoting *Apprendi*, 530 U.S. at 488). However, the *Apprendi* Court did not specifically identify a jury trial as being a required procedural safeguard. As the Eighth Circuit observed:

> [W]hile the Court [in *Apprendi*] established what constitutes sufficient procedural safeguards (a right to jury trial and proof beyond a reasonable doubt), and what does not
> (judge-made
> findings under a lesser standard of proof), the Court did not take a position on possibilities that lie in between these two poles.

*Id.* As a result, the *Smalley* court concluded that:

> [T]he question of whether juvenile adjudications should be exempt from *Apprendi*'s general rule should not turn on the narrow parsing of words, but on an examination of whether juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption. We believe that they are.

*Id.* at 1032-33.

¶19 The State argues that juvenile adjudications carry sufficient procedural safeguards to qualify them as prior convictions under the *Apprendi* exception. Washington courts have a long history of considering juvenile adjudications in sentencing hearings. In *State v. Dainard*, 85 Wn.2d 624, 627-28, 537 P.2d 760 (1975), this court held that a trial court may consider an adult defendant's juvenile record in a sentencing hearing. The legislature has dictated that juvenile adjudications may be included in an adult offender's

criminal history and, in some circumstances, that a court may score juvenile adjudications as equivalent to adult offenses. RCW 9.94A.030(14), .525(8), (9), (16). Finally, the Juvenile Justice Act of 1977 (JJA), chapter 13.40 RCW, specifically mandates numerous safeguards for juvenile adjudications, such as the right to notice, counsel, discovery, an opportunity to be heard, confrontation of witnesses, and an unbiased fact finder. RCW 13.40.140.[4]

¶20 Despite the evidence of the reliability of and the historical reliance on juvenile adjudications, Weber maintains that juvenile adjudications do not fall under the *Apprendi* exception because they are not convictions. Weber argues that the focus of the juvenile justice system "is on rehabilitation rather than assigning criminal responsibility and punishment." Pet. for Review at 10 (citing *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966); *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971)). However, as Weber himself notes, "[s]ubsequent amendments to the JJA have altered the statute's focus and imposed more traditional criminal punishment following an adjudication of guilt." Suppl. Br. of Pet'r at 14 n.15. A 1997 amendment to the JJA provides, " '[a]djudication' has the same meaning as 'conviction' in RCW 9.94A.030, and the terms must be construed identically and used interchangeably." RCW 13.04.011(1).

¶21 While a goal of juvenile adjudication is rehabilitation, our State's system anticipates that individuals who are not rehabilitated and who reoffend as adults may be punished in a manner that considers their preceding juvenile criminal behavior. In the absence of authoritative instruction from the United States Supreme Court that juvenile adjudications are not prior convictions, and in light

---

[4] Weber argues that juvenile adjudications are less reliable than adult convictions. Pet. for Review at 12-14; Suppl. Br. of Pet'r at 16-17. However, Weber does not provide any proof that juvenile adjudications are less reliable, nor does he specifically analyze juvenile proceedings in Washington. Additionally, this argument does not refute the long-standing policy of the legislature and Washington courts to utilize juvenile adjudications in sentencing.

of the aforementioned strong state indicators, we hold that juvenile adjudications are convictions for the purposes of *Apprendi*'s prior conviction exception. Therefore, we affirm the Court of Appeals determination that Weber's due process and jury trial rights are not violated by including Weber's juvenile adjudication in his offender score.[5]

B.  Whether second degree attempted murder or first degree assault is the "lesser" offense for double jeopardy purposes

■■ ¶22 The United States Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The Washington Constitution provides that no person shall "be twice put in jeopardy for the same offense." WASH. CONST. art. I, § 9. "The federal and state [double jeopardy] provisions afford the same protections and are 'identical in thought, substance, and purpose.'" *In re Pers. Restraint of Davis*, 142 Wn.2d 165, 171, 12 P.3d 603 (2000) (quoting *State v. Schoel*, 54 Wn.2d 388, 391, 341 P.2d 481 (1959)). The prohibition against double jeopardy "'protect[s] against multiple punishments for the same offense, as well as against a subsequent prosecution for the same offense after acquittal or conviction.'" *State v. Graham*, 153 Wn.2d 400, 404, 103 P.3d 1238 (2005) (quoting *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004)). Division One of the Court of Appeals has held that the proper remedy for multiple punishments for the same offense is to vacate the "lesser" offense. *In re Pers. Restraint of Burchfield*, 111 Wn. App. 892, 899, 46 P.3d 840 (2002).

¶23 In a pretrial hearing before the trial court, the State conceded that if the jury convicted Weber of both the attempted murder and the assault charges, the convictions

---

[5] We note that even if we were to hold that a jury must find the fact that a juvenile adjudication *occurred*, the underlying juvenile adjudication would still not be the result of a jury trial. Thus, under Weber's analysis, we would have to hold that the juvenile adjudication itself must be the result of a jury trial in order for the adjudication to be used to enhance a defendant's sentence based on recidivism. Suppl. Br. of Pet'r at 23. This we decline to do.

would constitute double jeopardy because both convictions would punish Weber for the same offense. VRP (June 11, 2003) at 62. The State promised that if the jury convicted Weber on both charges, it would ask the court to vacate the lesser offense. *Id.* After the jury found Weber guilty of both second degree attempted murder and first degree assault, the trial court vacated the assault conviction because the attempted murder conviction carried the greater seriousness level and required greater intent. VRP (Aug. 8, 2003) at 24. The Court of Appeals reversed, vacating the second degree attempted murder conviction and reinstating the first degree assault conviction because the assault conviction carried the longer sentence. *Weber*, 127 Wn. App. at 882, ¶ 3.

¶24 Both Weber and the State agree that the remedy for double jeopardy is to vacate the conviction for the lesser offense, but they dispute which of Weber's two convictions constitutes the lesser offense in this case. Under Washington law, assault is not a lesser included offense of attempted murder. *State v. Harris*, 121 Wn.2d 317, 321, 849 P.2d 1216 (1993). The State argues that when neither offense is a lesser included offense, the lesser offense for double jeopardy purposes is the offense that carries the lesser sentence. Suppl. Br. of Resp't at 23-27. The standard sentence range for first degree assault is slightly higher than the standard sentence range for attempted second degree murder.[6] Therefore, the State argues that second degree attempted murder is the lesser offense in this case.

¶25 Weber, on the other hand, asserts that the proper remedy for a double jeopardy violation is still "to vacate the conviction for the crime that forms part of the proof of the other unless the Legislature has expressly stated its intent

---

[6] The trial court assigned Weber an offender score of 8, which produced a standard range of 209 to 277 months for first degree assault and 192.75 to 267.75 months for attempted second degree murder. RCW 9.94A.510. However, that offender score did not include Weber's juvenile adjudication for attempted first degree robbery, which we hold should be included in the offender score. With the juvenile adjudication, Weber would have an offender score of 9 or more, which would produce a standard range of 240 to 318 months for first degree assault and 223.5 to 297.75 months for attempted second degree murder. *Id.*

that the crimes be punished separately or the constituent offense stand." Suppl. Br. of Pet'r at 24 (citing *Whalen v. United States*, 445 U.S. 684, 692, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980); *State v. Freeman*, 153 Wn.2d 765, 775, 108 P.3d 753 (2005)). However, *Whalen* guides only the determination of whether to impose multiple punishments, not the determination of which conviction a court should vacate once the court has determined that multiple punishments are improper, as is the case here. 445 U.S. at 692.

¶26 Moreover, contrary to Weber's argument, *Freeman* supports the proposition that the length of sentence is an important consideration in determining which conviction to vacate. In *Freeman*, this court considered whether the legislature authorized separate punishments for assault and robbery. 153 Wn.2d at 771. In so considering, the court reasoned that the legislature would not have intended the double jeopardy doctrine to operate in a way that would allow the defendant to receive the lesser sentence.

> As the legislature is well aware, when a court vacates a conviction on double jeopardy grounds, it usually vacates the conviction for the crime that forms part of the proof of the other. This is because the greater offense "typically carries a penalty that incorporates punishment for the lesser included offense." Akhil Reed Amar & Jonathan L. Marcus, *Double Jeopardy Law After Rodney King*, 95 COLUM. L. REV. 1, 28 (1995). But when a first degree assault raises a robbery to first degree robbery, the case is atypical. The standard sentence for first degree assault (in this case, 111 months) is considerably longer than the standard sentence for first degree robbery (in this case, 41 months). Given the fact of the current sentencing schema, it is unlikely the legislature intended this result. While this is not necessarily dispositive, it does weigh upon our analysis. *Cf. Burchfield*, 111 Wn. App. at 900 (considering the seriousness level assigned by the legislature when determining how the legislature intended two related crimes to be treated).

*Id.* at 775-76 (citations omitted).

¶27 In *Burchfield*, Division One of the Court of Appeals similarly focused on length of sentence, in addition to

seriousness level and degree of felony, in determining which offense to vacate as the lesser offense. 111 Wn. App. at 900. The court rejected Burchfield's argument that assault was the lesser offense because it results only in injury, whereas manslaughter results in death. *Id.* at 899. "If we were to accept Burchfield's argument, resentencing for the 'more serious' offense would require a reduction of his sentence from 135 months, the standard range for first degree assault with a weapon enhancement, to 53 months, the standard range for his first degree manslaughter conviction." *Id.* at 900. However, *Burchfield* does not present the same situation as this case because in *Burchfield*, other factors, such as seriousness level and class of felony, also favored vacating manslaughter as the lesser offense.

¶28 Because second degree attempted murder and first degree assault are both class A felonies, Weber argues that the lesser offense should consist of the offense that carries the lesser seriousness level and intent requirement. Suppl. Br. of Pet'r at 25-27. However, as the State notes, "the seriousness level is only another, less direct way of examining which crime involves greater punishment" because "[u]nder the SRA, the sole purpose of a crime's seriousness level is to calculate the standard range." Suppl. Br. of Resp't at 26 (citing RCW 9.94A.510, .520). Moreover, the sentencing guidelines do not provide a seriousness level for attempted offenses, making this comparison impossible.[7] Additionally, as the State notes, anticipatory crimes may necessarily require greater intent than a completed crime because they may include the element of "intent to commit the completed crime." Suppl. Br. of Resp't at 27.

¶29 Weber also points to *State v. Valentine*, 108 Wn. App. 24, 26-27, 29 P.3d 42 (2001), in which Division One of the

---

[7] The State suggests that because the SRA provides that the standard sentence range for an attempted offense is 75 percent of the standard range for a completed offense, the seriousness level for attempted second degree murder could be 75 percent of the seriousness level for second degree murder (which carries a seriousness level of 14), computing to a seriousness level of 10.5. Suppl. Br. of Resp't at 26; *see* RCW 9.94A.510, .515. Therefore, first degree assault, which carries a seriousness level of 12, would have the greater seriousness level. RCW 9.94A.515.

Court of Appeals considered the remedy for double jeopardy involving the same convictions as in this case—second degree attempted murder and first degree assault. Pet. for Review at 17-18. The *Valentine* court summarily vacated the assault conviction without any analysis as to why it constituted the lesser offense. 108 Wn. App. at 29. However, *Valentine* is distinguishable from this case because the standard sentence range for the attempted murder conviction was higher than the standard range for the assault conviction in that case. *Id.*

¶30 Other jurisdictions have also held that the "lesser" crime for double jeopardy purposes is the conviction that carries the lesser punishment. *See, e.g., People v. Driggers*, 812 P.2d 702, 704 (Colo. Ct. App. 1991) (vacating crime with lesser punishment as remedy for double jeopardy); *State v. Dillon*, 2001 S.D. 97, 632 N.W.2d 37, 46-47 (2001) (vacating first degree rape conviction because it had "lower minimum penalty"); *People v. Davis*, 122 Mich. App. 597, 608-09, 333 N.W.2d 99 (1983) (holding that where lesser included offense provided for longer prison term, remedy for double jeopardy was vacation of greater offense); *Landers v. State*, 957 S.W.2d 558, 559-61 (Tex. Crim. App. 1997) (adopting the "most serious punishment" test in determining which conviction to retain).

¶31 Additionally, we note that if Weber had received concurrent sentences for his two convictions, he would be required to serve the longer of the two sentences. RCW 9.94A.589. Thus, retaining the offense that carries the greater sentence is the commonsense approach. The facts of this case dictate that we follow the straightforward approach of vacating the offense that carries the lesser sentence as the lesser offense. As a result, we hold that the lesser offense for double jeopardy purposes in this case is second degree attempted murder and affirm the Court of Appeals decision to vacate the second degree murder conviction and reinstate the first degree assault conviction.

C.  Whether prosecutorial misconduct caused Weber preju-
dice requiring reversal of his convictions

¶32  To prove prosecutorial misconduct, the defen-
dant bears the burden of proving that the prosecuting
attorney's conduct was both improper and prejudicial. *State
v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997) (citing
*State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)). In
order to prove the conduct was prejudicial, the defendant
must prove there is a " 'substantial likelihood the miscon-
duct affected the jury's verdict.' " *In re Pers. Restraint of
Pirtle*, 136 Wn.2d 467, 481-82, 965 P.2d 593 (1998) (quoting
*State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).
Reversal is not required " 'unless, within reasonable prob-
abilities, the outcome of the trial would have been materi-
ally affected had the error not occurred.' " *State v. Bour-
geois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting
*State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

¶33  If the defendant does not object to alleged
misconduct at trial, the issue of prosecutorial misconduct is
usually waived unless the misconduct was "so flagrant and
ill-intentioned that it evinces an enduring and resulting
prejudice that could not have been neutralized by an
admonition to the jury." *State v. Stenson*, 132 Wn.2d 668,
719, 940 P.2d 1239 (1997) (citing *State v. Gentry*, 125 Wn.2d
570, 596, 888 P.2d 1105 (1995)). Weber did not object to the
first two alleged instances of misconduct. VRP (June 25,
2003) at 9-11. At the Court of Appeals, the State argued that
Weber did not need to object to the prosecuting attorney's
improper questions because the court had already granted
Weber's motion in limine to exclude the admitted testimony,
citing *Fenimore v. Donald M. Drake Construction Co.*, 87
Wn.2d 85, 92, 549 P.2d 483 (1976), and *State v. Smith*, 189
Wash. 422, 65 P.2d 1075 (1937). Br. of Resp't at 11 n.4.
However, in this court, the State changes its position and
argues that defense counsel failed to object, which it inter-
prets as an indication that "any possible prejudice was
minimal." Suppl. Br. of Resp't at 29. Because the State
changed its position and its original argument reflects a
misreading, or at least an overstatement, of the law, we

resolve the issue of whether or not Weber's failure to object should be held against him.

¶34 The State's argument at the Court of Appeals reflects a misreading of *Fenimore* and a possible overstatement of the rule from *Smith*. *Fenimore* stands for the proposition that when a trial court *properly denies* a party's motion to exclude evidence *and* instructs that party to object to the evidence when offered at trial, the party is not "relieved of the burden of objecting to evidence which he believed to be inadmissible." 87 Wn.2d at 92. Following *Fenimore*, this court held that a party *losing* a motion to exclude evidence has a standing objection to the admission of that evidence at trial unless instructed by the court to continue to object. *State v. Kelly*, 102 Wn.2d 188, 193, 685 P.2d 564 (1984) (citing *State v. Koloske*, 100 Wn.2d 889, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988)). These cases do not guide the determination of whether Weber was required to object because Weber's motion to exclude evidence was granted, not denied.

¶35 In a 1937 case, this court held that a party's failure to object to evidence already excluded by a pretrial motion was "not controlling" and did not prevent the defendant from receiving a new trial. *Smith*, 189 Wash. at 429. However, the Court of Appeals has concluded that the rule from *Smith* should apply only in limited circumstances because in that case the State demonstrated a "deliberate disregard" for the pretrial order and because an objection "was likely more damaging than almost any answer" in that case. *State v. Sullivan*, 69 Wn. App. 167, 173, 847 P.2d 953 (1993). The Court of Appeals reasoned that the complaining party must continue to object because even if the trial court has determined that certain evidence is inadmissible, the court may not have considered how prejudicial the evidence is or what the remedy for its admission should be. *Id.* at 172. Additionally, as the Court of Appeals noted, there is great potential for abuse when a party does not object because "[a] party so situated could simply lie back, not

272

allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal." *Id.* In this case, the Court of Appeals considered *Sullivan* in determining whether Weber was required to object despite winning his pretrial motions. *Weber*, No. 52911-1-I at 15-16.

¶36 We follow the commonsense approach of the Court of Appeals and consider Weber's failure to object even though he received pretrial orders that allegedly excluded the admitted evidence. Without an objection, the trial court never had an opportunity to determine whether the evidence would even have been covered by the pretrial motions or, if it was covered by the motions, whether the court could have cured any potential prejudice through an instruction. Thus, even when the trial court has already excluded evidence through a pretrial order, the complaining party should object to the admission of the allegedly inadmissible evidence in order to preserve the issue for review, unless an unusual circumstance exists "that makes it impossible to avoid the prejudicial impact of evidence that had previously been ruled inadmissible." *Sullivan*, 69 Wn. App. at 173. Examples of such unusual circumstances are when the other party's questions were "in deliberate disregard of the trial court's ruling" or "an objection by itself would be so damaging as to be immune from any admonition or curative instruction by the trial court." *Id.*; *see Smith*, 189 Wash. at 428-29. Here, it is not clear that the State's questions were in deliberate disregard of the court's ruling or that an objection from Weber would have been so damaging that an instruction would not have cured any prejudice.

¶37 Weber maintains that the prosecuting attorney committed misconduct that constitutes reversible error in three ways. First, the prosecuting attorney disregarded a pretrial order by soliciting evidence that Detective Alvarez had previously met Weber while investigating his brother for a crime. Pet. for Review at 19. Second, the prosecuting attorney disregarded another pretrial order by introducing evi-

dence of gang membership. *Id*. at 20. Third, the prosecuting attorney made improper arguments during rebuttal closing argument. *Id*. at 21-22. Finally, Weber argues that even if each individual instance of misconduct does not constitute reversible error, the cumulative error doctrine applies. *Id*. at 23. The State concedes that the prosecuting attorney did commit misconduct in the three instances identified by Weber but asserts that the misconduct was not prejudicial and, therefore, does not constitute reversible error and that Weber's cumulative error claim fails. Br. of Resp't at 11, 15, 17, 21.

1. Evidence that the detective met Weber while investigating his brother

¶38 Weber asserts that the prosecuting attorney committed misconduct by disregarding a pretrial order that excluded evidence that Detective Alvarez met Weber while investigating his brother as a suspect in a stabbing incident. Pet. for Review at 19. During the prosecuting attorney's direct examination of Detective Alvarez, the following exchange occurred:

Q. Who was that?

A. Charles Webber [sic].

Q. Did that name mean anything to you?

A. Yes, it did.

Q. Explain why.

A. Approximately a year prior to that, I was investigating or assisting with an investigation of a stabbing incident where Charles's brother was the prime suspect. And I had contacted Charles during the course of that investigation.

VRP (June 25, 2003) at 9.

¶39 In a pretrial hearing, the trial court excluded evidence that Detective Alvarez had previously met Weber while investigating a crime involving Weber's brother. VRP (June 11, 2003) at 25. However, the court explicitly did not exclude evidence that the detective had previously met Weber. *Id*. The State concedes that Detective Alvarez's

testimony violated the pretrial order but argues that Weber still must prove that the error likely affected the jury's verdict. Br. of Resp't at 11-12.

¶40 At trial, Weber's attorney failed to object to the error, request a curative instruction, or move for a mistrial. The Court of Appeals determined that the prosecuting attorney did not deliberately disregard the pretrial order. *Weber*, No. 52911-1-I at 17. We agree that the prosecuting attorney did not so clearly act in deliberate disregard of the pretrial order that Weber was excused from objecting. The pretrial order did not exclude evidence that the detective had previous contact with Weber, and the prosecuting attorney's questions conceivably could have been targeted only at soliciting that information.

¶41 Additionally, even if we do not hold Weber's failure to object against him, Weber has failed to prove that the prosecutor's questions caused him prejudice that affected the outcome of his trial. As the State notes, the content of Detective Alvarez's testimony may have been more helpful to Weber than prejudicial. Suppl. Br. of Resp't at 29. During the pretrial hearing, the trial court observed that if the jury heard that Alvarez had previous contact with Weber, the jury might make the inference that Alvarez knew Weber from previous arrests or criminal activity. VRP (June 11, 2003) at 18. Defense counsel agreed and acknowledged that he might later "choose to introduce the context in which he knows Mr. Webber [sic]." *Id.*

¶42 Weber failed to preserve the error on appeal by not objecting. He also failed to carry his burden of proving that there is a substantial likelihood that the prosecutor's misconduct affected the jury's verdict. As a result, we hold that the prosecuting attorney did not commit misconduct warranting a new trial in this instance.

2. Evidence of gang membership

¶43 Second, Weber asserts that the prosecuting attorney committed misconduct by violating a pretrial order excluding evidence of gang membership. The following exchange

also occurred during the prosecuting attorney's direct examination of Alvarez:

Q. Have you ever in your contacts with anyone as a patrol officer, ever observed anyone besides the defendant Charles Webber [sic] with a 206 tattoo on the back of his neck?

A. No.

Q. What about during the course of your duties as a special enforcement agent in investigating gangs, have you ever come across another individual with the tattoo of a 206 on the back of his neck?

A. Not of that size, no.

VRP (June 25, 2003) at 10-11.

¶44 In a pretrial hearing, the trial court excluded all evidence of gang membership but did not exclude evidence of "any marks that may have been observed by any witness or testimony of any marks that may currently be present on Mr. Webber [sic]." VRP (June 10, 2003) at 147; VRP (June 11, 2003) at 10. The State concedes that the prosecuting attorney's question violated the pretrial order but argues that it was not so prejudicial that it likely affected the jury's verdict. Br. of Resp't at 15.

¶45 Again, Weber's attorney failed to object to the error, request a curative instruction, or move for a mistrial. And again, the record does not so clearly indicate that the prosecuting attorney deliberately disregarded the pretrial order as to excuse Weber's failure to preserve the error on appeal. The pretrial order did not exclude evidence of "marks that may have been observed by any witness," and the prosecuting attorney's questions conceivably could have been targeted only at soliciting that information.

¶46 Previously, Alvarez testified that he "primarily handle[s] gang cases or gang incidents." VRP (June 25, 2003) at 7. It is clear from the record that the prosecuting attorney's questions about the tattoos were targeted at establishing how common "206" tattoos are in the effort to identify Weber as the shooter. The questions were not clearly targeted at establishing that Weber was a gang

member. Additionally, Alvarez's answer indicated that he had not seen a "206" tattoo the size of Weber's in his work investigating gangs, an answer that resulted in minimal, if any, prejudice.

¶47 Moreover, as the State notes, Alvarez's testimony that he primarily investigates gang incidents "was not the subject of a motion in limine, nor was it objected to." Br. of Resp't at 16; VRP (June 25, 2003) at 7. Several other witnesses testified regarding the tattoo on Weber's neck, including Manzo, who testified without objection that the "206" tattoo stood for "the area that you live in." VRP (June 18, 2003) at 131-32. The "admission of testimony that is otherwise excludable is not prejudicial error where similar testimony was admitted earlier without objection." *Ashley v. Hall*, 138 Wn.2d 151, 159, 978 P.2d 1055 (1999).

¶48 Thus, even if we do not hold Weber's failure to object against him, Weber has failed to prove that Alvarez's testimony affected the outcome of his case. This is particularly true in light of the other testimony that the trial court admitted regarding "206" tattoos and gang activity, and in light of the other evidence presented against Weber at trial. As a result, we hold that Weber has failed to prove that the prosecutor's questions caused him prejudice that affected the outcome of his trial.

### 3. Improper argument in rebuttal closing argument

¶49 Third, Weber argues that the prosecuting attorney committed misconduct by making prejudicial statements in rebuttal closing argument. Weber asserts that although prosecuting attorneys have some latitude to argue facts and inferences from the evidence, they are not permitted to make prejudicial statements not supported by the record. *State v. Rose*, 62 Wn.2d 309, 312, 382 P.2d 513 (1963) (citing *State v. Heaton*, 149 Wash. 452, 271 P. 89 (1928); *Rogers v. Kangley Timber Co.*, 74 Wash. 48, 132 P. 731 (1913)). However, even improper remarks by the prosecutor are not grounds for reversal "if they were invited or provoked by defense counsel and are in reply to his or her

acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." *Russell*, 125 Wn.2d at 86 (citing *State v. Dennison*, 72 Wn.2d 842, 849, 435 P.2d 526 (1967); *State v. Graham*, 59 Wn. App. 418, 428-29, 798 P.2d 314 (1990)).

¶50 The State concedes that the prosecuting attorney's remarks in rebuttal closing argument were improper but asserts that they were unlikely to have affected the jury's verdict. Br. of Resp't at 17. In rebuttal closing argument, the prosecuting attorney, Andy Colasurdo, made the following statements:

> Now, there are cases that go before court all the time, like murders where there is no victim to explain what had happened. No eyewitness to the crime. Yet, we prove those.
>
> In another unit in my office, SAU, the Special Assault Unit where you deal with sex crimes—
>
> Mr. Hall: Objection, your honor. There is no foundation for that type of evidence.
>
> The court: Overruled.
>
> Mr. Colasurdo: You deal with crimes against small children, crimes where a child has been molested.
>
> Mr. Hall: Objection, your honor. Also, no foundation for that type of argument.
>
> The court: Why don't you move on.
>
> Mr. Colasurdo: It's a legitimate argument, your honor.
>
> The court: Move on, counsel.
>
> Mr. Colasurdo: There are times for which there are no witnesses and for which there are, as I just mentioned, no evidence. Yet people are convicted of those crimes all the time.
>
> Why? Because a jury finds someone credible.

VRP (June 30, 2003) at 70-71. However, defense counsel, Randall Hall, made the following statements in his earlier closing argument:

> Ladies and gentlemen, please take just 20 seconds and imagine, if you can, someone that you are very close to being accused of committing an awful crime, and what you would expect the jury to hear as evidence.

Well, you would certainly expect to hear from eyewitnesses, wouldn't you? This case had eyewitnesses as well. But did you hear from them? No.

. . . .

That is the state's obligation to bring these witnesses in.

*Id.* at 47-48. And defense counsel continued:

Well, besides witnesses, wouldn't you like to hear or see something about physical evidence. . . .

What didn't you see? You didn't see a gun. You didn't see fingerprints.

. . . .

How about a thorough search.

. . . .

They didn't do it. Why? They either didn't want you to have the information or they were negligent about how they conducted the investigation.

The end result is the same. You don't have the information that you need to be able to make a decision in this case.

*Id.* at 49-51.

¶51 The State argues that the prosecuting attorney's argument, although improper, was made in response to defense counsel's argument about the type of evidence that the State was required to produce. Br. of Resp't at 18. The State cites *State v. Farr-Lenzini*, 93 Wn. App. 453, 471, 970 P.2d 313 (1999), in which the prosecuting attorney responded to defense counsel's argument that the defendant did not fit the profile of an eluder by stating that Ted Bundy did not fit the profile of a mass murderer. The Court of Appeals held that the prosecuting attorney's remarks were a "rhetorical overreaction to a defense argument" but that they did not deny the defendant a fair trial because they were addressed through the jury instructions. *Id.*

¶52 In this case, the prosecuting attorney's argument was clearly a response to defense counsel's argument. Additionally, the court instructed the jury to base its decision only on the testimony of witnesses and exhibits in

the case and that the attorneys' arguments were not evidence. CP at 45-46. As a result, we hold that Weber has failed to prove that the prosecuting attorney's remarks were so prejudicial that they could not be cured by the jury instructions.

### 4. Cumulative error doctrine

¶53 Finally, Weber asserts that the cumulative error doctrine applies to the prosecutor's misconduct. Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial. *Id.* As discussed above, Weber has failed to prove how each alleged instance of misconduct affected the outcome of his trial. Similarly, Weber has not indicated how these combined instances of misconduct affected the outcome of his trial. As a result, we hold that Weber's cumulative error doctrine claim fails in this case and that the prosecuting attorney did not commit misconduct that constituted reversible error.

## IV. CONCLUSION

¶54 We hold that the inclusion of Weber's juvenile adjudications in his offender score fell under *Apprendi*'s prior conviction exception and did not violate *Blakely*. We also hold that, in this case, the proper remedy for Weber's double jeopardy violation is to vacate the conviction that carries the lesser sentence. Finally, we hold that the prosecuting attorney did not commit misconduct warranting a new trial. We affirm the Court of Appeals and remand the case to the trial court for resentencing consistent with this opinion.

ALEXANDER, C.J., and BRIDGE, OWENS, and J.M. JOHNSON, JJ., concur.

¶55 MADSEN, J. (dissenting) — The majority holds that juvenile adjudications count as prior convictions and there-

fore are not subject to the rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). The majority's holding is inconsistent with the United States Supreme Court's reasons for excluding prior convictions from the rule, and with statutes and case law from this state. Fundamentally, the majority's conclusion condones a significant violation of Mr. Weber's due process rights and further undermines the purposes of our Juvenile Justice Act of 1977, chapter 13.40 RCW.

¶56 In addition, prosecutorial misconduct in this case requires a new trial, contrary to the majority's view. I respectfully dissent.

## ANALYSIS

¶57 In addressing the question whether a juvenile adjudication counts as a prior conviction for purposes of *Apprendi*'s rule, the majority unfortunately dismisses the importance of the other cases that give meaning to the rule, leading to its erroneous conclusion that juvenile adjudications count as prior convictions. When the Court decided *Apprendi*, it did not do so in a vacuum. Rather, *Apprendi* drew from prior decisions. The Court could not have been clearer about this, as it explained:

> The question whether Apprendi had a constitutional right to have a jury find [asserted] bias on the basis of proof beyond a reasonable doubt is starkly presented.
>
> Our answer to that question was foreshadowed by our opinion in *Jones* v. *United States*, 526 U.S. 227[, 119 S. Ct. 1215, 143 L. Ed. 2d 311] (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a

reasonable doubt." [526 U.S.] at 243, n.6. The Fourteenth Amendment commands the same answer in this case involving a state statute.

. . . .

[O]ur reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in *Jones*. Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Apprendi*, 530 U.S. at 475-76, 490. The rule was subsequently refined by the Court when it added that "statutory maximum" means the maximum sentence that a judge may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely v. Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (emphasis omitted).

¶58 To understand *Apprendi*, it is imperative to understand *Jones* because in *Jones* the Court explained why it had held it was permissible, in *Almendarez-Torres v. United States*, 523 U.S. 224, 243-44, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998), to use a prior conviction as a sentencing factor to increase a statutorily mandated maximum punishment.[8] The Court said in *Jones* that "unlike virtually any other consideration used to enlarge the possible penalty for an offense, . . . a prior conviction must itself have been established through procedures satisfying *the fair notice, reasonable doubt, and jury trial guarantees.*" *Jones*, 526 U.S. at 249 (emphasis added).[9]

---

[8] The defendant in *Almendarez-Torres* argued that the fact of his prior conviction, used to increase his punishment, was an element of the offense that had to be set out in the indictment. The Court rejected the argument.

[9] The majority incorrectly reads *Jones*. See majority at 260-61. When read in context, the word "possible" refers to "the possible constitutional distinctiveness" of recidivism from "other facts that might extend the range of possible sentencing." *Jones*, 526 U.S. at 249. The Court did not imply that any constitutional safeguards other than fair notice, proof beyond a reasonable doubt, or the right to jury trial would be sufficient for a prior conviction to come within the "prior conviction" exception to the *Apprendi* rule, contrary to the majority's conclusion.

¶59 Thus, the prior conviction exception to the rule stated in *Apprendi* is premised on there having been specific constitutional safeguards underlying a prior conviction used to increase the punishment for a subsequent offense. Therefore, in order to fall within the prior conviction exception to the rule in *Apprendi*, a juvenile adjudication must have had the same constitutional safeguards in place as in *Jones*, in particular the right to trial by jury and proof beyond a reasonable doubt.

¶60 Other courts have reached this conclusion after carefully examining the Court's cases. In *United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir. 2001), the Ninth Circuit read *Jones* and *Apprendi* to mean that "the 'prior conviction' exception to *Apprendi*'s general rule must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt." If juvenile adjudications lack these due process guaranties, the court reasoned, they do not fall within the exception. *Id.* Further, the Ninth Circuit said that insofar as the government argued that the exception should be extended to include nonjury juvenile adjudications, the "*Apprendi* Court's serious reservations about the reasoning of *Almendarez-Torres* counsel[ed] against any extension[s]." *Id.*; *see Apprendi*, 530 U.S. at 487, 489-90 (noting that it was arguable that *Almendarez-Torres* was wrongly decided). Other courts have also held that juvenile adjudications do not fall within the prior conviction exception. *State v. Harris*, 339 Or. 157, 118 P.3d 236 (2005); *State v. Brown*, 03-2788 (La. 7/6/04), 879 So. 2d 1276.

¶61 The majority rejects *Tighe* and similar cases, relying instead on the reasoning of courts that have concluded that juvenile proceedings provide sufficient procedural safeguards to qualify under the prior conviction exception. In *United States v. Smalley*, 294 F.3d 1030, 1032-33 (8th Cir. 2002), for example, the court reasoned that whether juvenile adjudications should be exempt from *Apprendi*'s rule should turn on "an examination of whether juvenile adju-

dications, like adult convictions, are so reliable that due process of law is not offended by such an exemption." *See also, e.g., United States v. Jones*, 332 F.3d 688 (3d Cir. 2003); *State v. Hitt*, 273 Kan. 224, 42 P.3d 732 (2002).

¶62 This reliance is misplaced. There are critical differences between the due process necessary for a juvenile adjudication and the due process safeguards required for an adult conviction. The differences exist because the juvenile justice system is fundamentally different from and serves different purposes than the criminal justice system.

¶63 While the Juvenile Justice Act has been amended many times over the years, the act has always focused on the needs of the juvenile and the goals of rehabilitation and accountability. *State v. Watson*, 146 Wn.2d 947, 952-53, 51 P.3d 66 (2002); *Monroe v. Soliz*, 132 Wn.2d 414, 419-20, 939 P.2d 205 (1997) (Juvenile Justice Act's policy is holding juveniles accountable for their acts and responding to the needs of juvenile offenders); *State v. Schaaf*, 109 Wn.2d 1, 4, 743 P.2d 240 (1987) (juvenile justice system is rehabilitative in nature while the criminal system is punitive); *State v. Meade*, 129 Wn. App. 918, 925, ¶ 15, 120 P.3d 975 (2005) (Juvenile Justice Act remains focused on rehabilitation); *State v. K.E.*, 97 Wn. App. 273, 982 P.2d 1212 (1999) (a court may impose a downward disposition if it finds that the standard range disposition would be an excessive penalty because less time is needed for rehabilitation); *State v. J.H.*, 96 Wn. App. 167, 172-75, 185, 978 P.2d 1121 (1999) (addressing 1997 amendments and concluding that legislative intent had changed only insofar as it increased the emphasis on responding to the needs of juvenile offenders, and the only purpose added to the Juvenile Justice Act list of purposes was encouragement of the juvenile's parents, guardian's, or custodian's active participation in the juvenile justice process; and, while fair to say that 1997 amendments increased emphasis on accountability for serious criminal activity, amendments also enhanced court's ability to address juvenile offenders' needs, with emphasis still placed on rehabilitation, whereas adult system focuses

almost entirely on punishment); *see also, e.g.*, RCW 13-.40.010(2) (listing goals of the Juvenile Justice Act, including protection of the public, accountability, punishment, and provision of necessary treatment for juvenile offenders); RCW 13.40.320 (addressing juvenile offender basic training camps and stating that they must emphasize building self-esteem, confidence, and discipline and shall include rehabilitation and training components); RCW 13.40.038 (state policy is that "juvenile detention facilities provide a humane, safe, and rehabilitative environment"); RCW 13-.40.460 (addressing administration of juvenile rehabilitation programs); RCW 13.40.500-.540 (concerning community juvenile accountability programs).

¶64 In fact, it is because of the fundamental difference between the juvenile justice system and the criminal system that the United States Supreme Court and this state's appellate courts have held that there is no right to a jury trial in the juvenile justice system. *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971); *Monroe*, 132 Wn.2d at 419-20; *Schaaf*, 109 Wn.2d 1; *State v. Lawley*, 91 Wn.2d 654, 591 P.2d 772 (1979); *In re Welfare of Estes*, 73 Wn.2d 263, 265-68, 438 P.2d 205 (1968); *cf. Meade*, 129 Wn. App. at 925-26, ¶ 16 (juvenile has no right to a jury to find facts that would support a manifest injustice disposition). In contrast, the criminal justice system is primarily punitive. *Monroe*, 132 Wn.2d at 420.

¶65 The decision in *McKeiver* that fundamental fairness does not require a jury trial in juvenile adjudications is based on the fact that the juvenile who is adjudicated is not treated as a criminal. This court found the same to be true of this state's juvenile justice system. *Lawley*, 91 Wn.2d 654. And with each new challenge following legislative amendments, as occurred in *Lawley*, the court has confirmed this conclusion. The Juvenile Justice Act still emphasizes accountability and rehabilitation, with individualized treatment of the offender.

¶66 Cases settling for a "reliability" standard for juvenile adjudications disregard the role that the jury plays in assuring a fair decision. The United States Supreme Court explained that the protection that comes with a jury entails more than merely finding the facts:

> The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it. Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence. The deep commitment of the Nation to the right of jury trial in serious criminal cases as a defense against arbitrary law enforcement qualifies for protection under the Due Process Clause of the Fourteenth Amendment, and must therefore be respected by the States.

*Duncan v. Louisiana*, 391 U.S. 145, 155-56, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968) (footnote omitted).

¶67 Because the right to a jury trial involves far more than a simple matter of determining the facts supporting a guilty verdict, the absence of that right in the juvenile justice system militates strongly against equating a juve-

nile adjudication to a criminal conviction obtained following a proceeding where the right to a jury trial attached. A juvenile adjudication without a jury determination does not compare to a criminal conviction following a trial by jury and should not be exempt from the rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

¶68 The majority also points out, though, that the legislature has dictated inclusion of juvenile adjudications in criminal history and enacted statutes providing that "adjudication" has the same meaning as "conviction." Majority at 263-64. Whether the legislature has included juvenile adjudications as part of criminal history has no bearing on whether these adjudications can be included under *Apprendi* and *Blakely*. As to RCW 13.04.011(1), which says that "adjudication" has the same meaning as "conviction," the Court of Appeals has correctly concluded that this definition has engendered some confusion about terminology but, regardless, the features of the juvenile justice system that have weighed against finding a right to a jury trial remain the same. *J.H.*, 96 Wn. App. at 175. The juvenile justice system and the criminal justice system are still demonstrably different, with different emphasis and different consequences.

¶69 Finally, most commentators addressing this issue argue forcefully that a juvenile adjudication does not fall within the "prior conviction" exception to the *Apprendi* rule. One says, in summary, that "[s]ince the juvenile system of justice was founded on the principle of rehabilitation, and continues to embrace the 'rehabilitative ideal' in modern times, there are significant constitutional differences in the degree of procedural due process and fundamental fairness involved in adult convictions and juvenile adjudications" and because "juvenile adjudications [are] subject to less stringent procedural standards than adult criminal proceedings," the *Apprendi* rule "must be limited to prior

convictions that were themselves obtained through proceedings affording individual defendants the same procedural safeguards they would be entitled to in the adult criminal justice system." Stephen F. Donahoe, Note, *The Problem With Forgiving (But Not Entirely Forgetting) the Crimes of Our Nation's Youth: Exploring the Third Circuit's Unconstitutional Use of Nonjury Juvenile Adjudications in Armed Career Criminal Sentencing*, 66 U. PITT. L. REV. 887, 907 (2005); *see also* Kimberly L. Johnson, Note & Comment, *Should Juvenile Adjudications Count as Convictions for* Apprendi *Purposes?*, 20 GA. ST. U. L. REV. 791 (2004) (juvenile adjudications do not come within the prior conviction exception to the *Apprendi* rule; the juvenile system is different from the criminal justice system in that juvenile adjudications have a rehabilitative purpose and juveniles do not have the same rights as adults in the criminal justice system, in particular the right to trial by jury).

¶70 Another concludes that the "Supreme Court's recent jury trial jurisprudence and its findings in *Ballew* [*v. Georgia*, 435 U.S. 223, 98 S. Ct. 1029, 55 L. Ed. 2d 234 (1978)] concerning the relative reliability of larger fact-finding bodies suggest that the *Tighe* court's understanding of juvenile adjudications is more constitutionally sound than that espoused by the *Smalley* court." Casenote, *Eighth Circuit Holds an Adjudication of Juvenile Delinquency To Be a "Prior Conviction" for the Purpose of Sentence Enhancement at a Subsequent Criminal Proceeding*—United States v. Smalley, *294 F.3d 1030 (8th Cir. 2002)*, 116 HARV. L. REV. 705, 712 (2002).

¶71 Others also favor the *Tighe* approach. *E.g.*, Jeremy W. Hochberg, Note, *Should Juvenile Adjudications Count as Prior Convictions for* Apprendi *Purposes?*, 45 WM. & MARY L. REV. 1159 (2004) (concluding that the United States Supreme Court should adopt the *Tighe* approach of a blanket ban on counting juvenile adjudications as prior convictions based on the fact that juvenile adjudications are fundamentally different from adult convictions in purpose

and procedure); Brian P. Thill, Comment, *Prior "Convictions" Under* Apprendi: *Why Juvenile Adjudications May Not Be Used to Increase an Offender's Sentence Exposure if They Have Not First Been Proven to a Jury Beyond a Reasonable Doubt*, 87 MARQ. L. REV. 573, 601 (2004) ("[i]n light of the Supreme Court's holding in *Apprendi* and the potentially devastating effects to one of the fundamental liberties afforded to the people of the United States under the Constitution, courts should heed the Supreme Court's warning and continue to view the [prior conviction] exception created in *Almendarez-Torres* as a narrow one"); Nicole M. Romine, Note, *A Compromised Solution: Balancing the Constitutional Consequences and the Practical Benefits of Using Juvenile Adjudications for Sentence Enhancement Purposes*, 45 WASHBURN L.J. 113, 133 (2005) (concluding that the current use of juvenile adjudications to enhance a criminal sentence is unconstitutional and proposing that states should pass statutes permitting use of "qualif[ied] juvenile adjudication[s]," i.e., adjudications following a juvenile adjudication where the juvenile had a jury trial and the right to counsel; "[b]y giving juveniles the same procedural protections afforded adults, such legislation would remove the constitutional concerns of using juvenile adjudications for sentence enhancement," and this course would "also benefit[ ] society by punishing continued criminality and protecting the public").

¶72 In sum, the reason for the prior conviction exception to the *Apprendi* rule is that the prior convictions themselves were accompanied by due process safeguards, including, most notably, the right to have a jury determine the underlying facts beyond a reasonable doubt. There is no substitute for the right to trial by jury. Since juveniles do not have the right to a jury in a juvenile adjudication, I would hold that their adjudications do not correspond to criminal convictions for purposes of the prior conviction exception to *Apprendi*'s rule.

¶73 The majority also concludes that prosecutorial misconduct does not require reversal. I disagree.

¶74 The first two claimed instances of misconduct involve violations of the trial court's pretrial rulings excluding evidence. As to these claims, Weber's counsel did not object at trial. I agree with the majority that the defendant should have an obligation to notify the trial court of the violation so that corrective action can be taken, if possible. However, I would not impose a heavy burden on the defendant with respect to preservation of such error. The defendant has, after all, already prevailed on the pretrial motion and "should be entitled to rely on that ruling without again raising objections" to admissibility of the evidence "during trial." *State v. Koloske*, 100 Wn.2d 889, 896, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989). Accordingly, the court should engage in every favorable inference in favor of the defendant when deciding whether the failure to object should preclude review of erroneous admission of evidence that was ruled inadmissible in a pretrial order.

¶75 Defying a pretrial ruling excluding testimony by Detective George Alvarez that he had previously met Weber during a criminal investigation of Weber's brother, the prosecutor asked questions that were bound to elicit testimony forbidden by the pretrial ruling. In particular, the open-ended "explain why" question asked after Detective Alvarez was asked whether the name Charles Weber meant anything to him, and he had answered "yes," was bound to lead to the circumstances associated with his criminal investigation of the defendant's brother—because those where the circumstances under which the detective knew the name. It strains credulity to think that the prosecution would not have foreseen where this questioning would lead and for the majority to dismiss it on the basis that the detective *could* have answered the question in another way. The State correctly concedes that error occurred. The majority incorrectly concludes the prosecuting attorney did not deliberately disregard the pretrial order.

¶76 The second claim of misconduct concerns the trial court's ruling excluding any reference to gang-related mem-

bership or expert testimony about gangs. The prosecuting attorney asked whether Detective Alvarez had ever observed, when he was a patrol officer, anyone besides the defendant with a "206" tattooed on the back of his neck, and the detective responded "no." The question was altered to cover the time Alvarez acted as a special enforcement agent investigating gangs, and Detective Alvarez responded that he had not seen "another individual" with such a tattoo "of that size." Later questions were asked about whether Weber's brother had a "206" tattooed on his neck.

¶77 Again, the State correctly concedes that the trial court's pretrial order was violated. The majority incorrectly concludes that there is no clear indication that the prosecuting attorney deliberately disregarded the pretrial order. As the Court of Appeals said, the violation is clear and inexcusable. The inference from this testimony was that the detective had seen others with a smaller version of the tattoo while he was investigating gangs and that Weber, who has such a tattoo, is a member of a gang. The questioning was in direct violation of the trial court's pretrial ruling, and it is inconceivable that the State could have pursued this line of inquiry without realizing it would lead to inferences about Weber and his brother being members of a gang. The State deliberately disregarded the trial court's ruling, and it is quite surprising that the majority concludes otherwise.

¶78 Finally, in closing argument, the prosecuting attorney responded to defense counsel's claim of insufficient evidence for a conviction by arguing that the State has successfully prosecuted other cases, including sex crimes and child molestation, where there have been no witnesses or direct evidence. Weber's counsel objected to this argument, and the court, after initially overruling the objection, then advised the prosecuting attorney to move on.

¶79 The majority accepts the proposition that this argument was in response to defense counsel's argument. Perhaps. But the defense is entitled to claim there is insufficient evidence for a conviction. The State is not entitled to

inflame the jury and encourage it to convict regardless of the evidence and the requirement of proof beyond a reasonable doubt.

¶80 I would conclude as to each instance of claimed misconduct that error occurred and that the error is properly before the court. The sole remaining question is whether the error is so prejudicial as to require reversal. Whether or not the prejudicial effect of each of these errors independently requires reversal, the cumulative effect is such that reversal is required. *See State v. Coe,* 101 Wn.2d 772, 789, 684 P.2d 668 (1984) (court finds that cumulative error requires a new trial); *State v. Greiff,* 141 Wn.2d 910, 929, 10 P.3d 390 (2000) (statement of cumulative error rule—cumulative error may warrant reversal, even if each error alone would not constitute reversible error).

¶81 These errors left the jury with the impression that Weber was a dangerous career criminal engaged in terrible crimes (evidence relating him to his brother and a previous criminal investigation; the impermissible evidence implying that Weber was involved in gangs; and the closing argument comparing this case and the lack of direct evidence with cases involving sex crimes and child molestation) who should and could be convicted despite a lack of evidence and in spite of the beyond-a-reasonable-doubt standard (the improper closing argument).

¶82 Based on prosecutorial misconduct, this case should be reversed and remanded for a new trial.

C. JOHNSON, SANDERS, and CHAMBERS, JJ., concur with MADSEN, J.