FILED
COURT OF APPEALS
DIVISION II

2013 NOV 13 AM 11: 16

STATE OF WASHINGTON

BY _____
                DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42599-8-II |
| Respondent, | |
| v. | |
| JUAN JOSE RECINOS, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, A.C.J. — Juan Jose Recinos appeals his jury convictions of attempted second

degree murder (two counts), vehicular assault, and failure to remain at the scene of an accident.

First, Recinos argues that the trial court committed evidentiary errors by erroneously admitting

(1) a 911 recording as an excited utterance, (2) his postarrest statements to police officers in

violation of *Miranda*,[1] and (3) photographs of him in handcuffs. Recinos also argues that his

defense counsel was ineffective and cumulative error deprived him of a fair trial. In his

statement of additional grounds (SAG), Recinos asserts that the prosecutor engaged in

misconduct in closing arguments and cross-examination by referring to his postarrest partial

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

silence and the trial court violated his speedy trial rights. We affirm and hold that (1) the trial court did not commit any evidentiary error because the 911 recording was an excited utterance, Recinos's postarrest statements to officers were spontaneous and voluntary, and the court properly weighed the photographs' probative value against their prejudicial effect; (2) defense counsel was not ineffective; (3) any comment on Recinos's postarrest partial silence was harmless error; (4) the court did not violate Recinos's speedy trial rights; and (5) cumulative error does not apply.

## FACTS

Juan and Tiffany Recinos were married and lived in Puyallup. Recinos threatened Tiffany that if he ever caught her having an affair, that he would kill them both. In mid-February 2010, Tiffany[2] began a romantic relationship with Arthur DeVone and later that month she spent the night with him. Two days later, Tiffany went to see DeVone at his parents' house. That night, DeVone drove Tiffany's car around Tacoma and Puyallup while Tiffany rode in the passenger's seat. Around 11:30 p.m., Tiffany saw Recinos in the adjacent lane, driving their family minivan. Recinos appeared angry. Suddenly bullets hit Tiffany's car. Then Recinos's minivan collided with the passenger side of her car. DeVone tried to drive away but Recinos bumped the back of Tiffany's car with the minivan. DeVone accelerated to 90 m.p.h., ran a red light, and collided with two other vehicles. When the car stopped, Tiffany was unconscious. DeVone got out of the vehicle but could not stand because his leg was injured.

---

[2] For clarity, we refer to Tiffany by her first name, intending no disrespect.

2

Recinos approached DeVone on foot, pointed a gun at his head, cocked it, and told him that he should kill them both. He then hit DeVone's head with the gun and walked away. DeVone, Tiffany, and another driver were hospitalized. DeVone suffered a broken leg and Tiffany underwent six surgeries due to her severe injuries.

Tiffany's mother and stepfather, Teresa and Mark Moreau,[3] also lived in Puyallup. Around midnight that night, Teresa was awakened by Recinos's phone call saying that he was coming to their house. When Recinos arrived, his pants, shoes, and socks were bloody and he told Teresa that he had "found them together" and had shot and T-boned Tiffany's car. 5 Verbatim Report of Proceedings (VRP) at 585. Recinos also told her that their children were home alone, so Teresa grabbed her keys, drove to Tiffany and Recinos's home, and called 911 from her cell phone while driving. Recinos then woke Mark. Soon, the police arrived at the Moreaus' home and arrested Recinos. On February 25, the State filed its initial charges against Recinos: two counts of attempted first degree murder, three counts of first degree assault, three counts of vehicular assault, and one count of failure to remain at the injury accident.

## I. PRETRIAL PROCEEDINGS

Trial was continued five times from the first trial date of July 6, 2010 to February 22, 2011. After pretrial hearings, the jury was called February 28. Although Recinos's counsel agreed to every continuance, Recinos objected to each one.[4]

---

[3] For clarity, we refer to Mark and Teresa in their individual capacity by their first name only, intending no disrespect. We refer to them collectively as the Moreaus.

[4] Also, Recinos requested redacted copies of discovery, which he claimed his attorneys had not provided to him. About a month later, he requested the copies again. The Department of Assigned Counsel's assistant director told the court that he would check into the situation.

At a pretrial CrR 3.5 hearing, Recinos moved to exclude admission of statements he made to Pierce County Sheriff's Deputy Aaron Thompson and Washington State Patrol Detective Julie Gundermann after his arrest. Deputy Thompson explained that he could not remember who but someone advised Recinos of his constitutional rights on the night of his arrest. And Recinos invoked his right to remain silent "immediately upon contact." VRP (Feb. 22, 2011) at 14. Deputy Thompson placed Recinos in his patrol car, and transported him, handcuffed, to the incident scene. During the drive, Recinos asked Deputy Thompson "if his wife, Tiffany, was okay." VRP (Feb. 22, 2011) at 16. Deputy Thompson responded that he did not know. Recinos then said that he had learned that his wife was having an affair with "a black man" and asked Deputy Thompson if he had any questions for him. VRP (Feb. 22, 2011) at 16. Deputy Thompson responded that he could not ask any questions because Recinos had invoked his right to remain silent. He then turned Recinos over to the state patrol at the scene of the incident and had no further contact with him.

Detective Gundermann testified that Recinos was transferred to the state patrol, and was placed in the patrol car's back seat still handcuffed. The detective knew that Recinos had been read his rights and she asked if he wanted to give a taped statement. He declined by saying he wanted to speak with an attorney first.

When Recinos asked Detective Gundermann what he was being arrested for and what was happening, the detective told him that there had been a collision and a shooting. Recinos said that he did not know anything about a collision or a gun. After observing an injury to Recinos's right hand, Detective Gundermann asked Recinos if he was injured, Recinos told her that he was not injured. The detective had no further communication with him.

4

The trial court concluded that Recinos was in custody at the time of his statements to Deputy Thompson and Detective Gundermann, that Recinos's statements were made sua sponte and that they were not the result of police interrogation. Thus, Recinos's statements were admissible.

## II. TRIAL

On February 28, the first day of trial, the State filed an amended information, charging Recinos with two counts of attempted second degree murder, two counts of first degree assault, one count of vehicular assault, and one count of failure to remain at the accident scene. Trial testimony was lengthy. DeVone, Tiffany, and the Moreaus testified to the facts as summarized above.[5] Detective Gundermann identified several photographs that showed Recinos in handcuffs. After Recinos's objection, the State argued that the cut on Recinos's hand was relevant. Among others, the court admitted (1) a front view of Recinos's full body seated in the patrol car with his hands behind his back; (2) showing Recinos's hands in handcuffs and a cut on one hand; and (3) showing a closer view of Recinos's hands in handcuffs. The court noted that the photographs supported the State's theory that the mark on Recinos's right hand was a laceration that could have been caused by the firearm's slide action that Recinos used to shoot at his wife's vehicle.

Christopher Hayes, Recinos's fellow inmate, testified that Recinos had told him that he tried to kill his wife because she was cheating on him, and that Recinos never told him that he was trying to save his wife or that his wife was kidnapped.

---

[5] The State also called Detective Gundermann, Deputy Thompson, the two other drivers of the vehicles involved in the accident, two witnesses who observed the accident and the scene, four forensic scientists with the state patrol, and Tiffany's family friend.

Recinos objected to admission of Teresa's 911 call. The 911 caller identified herself as Teresa Moreau. She told the operator that her son-in-law, Recinos, told her that he had shot the guy that her daughter was with and T-boned them in the car. Teresa explained that Recinos arrived at her home, that her husband was also there, that he told them what happened, and that she had just left to go get the kids. Recinos argued that Teresa's statements were inadmissible hearsay and did not qualify as an excited utterance. The State argued that it was an excited utterance considering Teresa's tone of voice, the language used, the call's timing, and that Teresa had firsthand knowledge of what Recinos told her. The court allowed the first two and one-half minutes of the recording to be played for the jury.

Pierce County Corrections Officer James Scollick testified about how the jail recorded inmate's phone calls and that he had recorded and copied several of Recinos's phone calls.

Lastly, Recinos took the stand. Recinos testified that he never threatened to kill Tiffany, he did not suspect that she was cheating on him, and he became worried when she did not return home from work that night so he went looking for her. He testified that when he saw her in her car that he feared she had been kidnapped so he shot at the tires to try to stop the car. Recinos also testified that he accidently rear-ended Tiffany's car twice because he was driving distracted, he was trying to find his cell phone to call the police, and Tiffany's car made two immediate stops and he was not able to brake fast enough. But, he testified that his van never intentionally hit Tiffany's car and that he checked on Tiffany after her car stopped but realized he could not help her so he left the scene concerned about his children who were home alone.

During cross-examination, the State asked Recinos if he remembered a phone call that he made to Jim Landon while in jail. When the State asked Recinos whether he had ever told

inconsistent stories about what happened the night of the incident, Recinos answered that he had not. The State then played the phone call's recording that Scollick had earlier identified[6] and asked:

> Mr. Recinos, would you agree with me that we just overheard you telling this individual, Jim—he asked you, I think, directly, Did you ever shoot at them? And you were heard saying no. And, Did you ever shoot at their car? And you were heard saying no?

6 VRP at 767-68. Recinos responded, "That's correct." The State then asks, "And yet a few moments ago you told this jury that you shot four to five times?" 6 VRP at 768. Recinos answered, "At the tires." 6 VRP at 768. Recinos did not object to the State playing the recording or the State's questions. Referring to Recinos's kidnapping fear theory, the State also asked Recinos, "And yet you chose not to tell anyone about this until today?" 6 VRP at 784. Recinos responded, "No, that's not true." 6 VRP at 784.

Then, during closing arguments, the prosecutor mentioned Recinos's kidnapping fear theory again.

> Why didn't he tell anybody that? . . .
> . . . Why didn't he call 911? . . .
> . . . .
> When the police were there waiting at the Moreau residence, he didn't tell the police, Whoa, there's been a big misunderstanding here, I was just trying to help, I thought she was kidnapped. . . .
> As a matter of fact, ladies and gentlemen, . . . you [are] the first people to hear about it, over a year later . . . . That's the first time the record, the evidence in this case ever indicates anything about a kidnapping, was yesterday.

7 VRP at 865-67.

---

[6] The record indicates, "(A portion of tape played.)" 6 VRP at 767. Presumably, this was exhibit 138, although the record does not indicate which exhibit number or which portion of the exhibit was played.

Outside the jury's presence, Recinos's counsel reported to the court that Recinos still had not received the redacted discovery. A few days later, Recinos notified the court that he had still not yet received the requested discovery. The next morning, Recinos's counsel then explained to the court his efforts regarding getting Recinos the discovery: that he had previously sent the transcripts to Recinos to review with the defense investigator, that he had requested redacted copies from the Department of Assigned Counsel for months, and that after the court indicated that Recinos could have unredacted copies, that he had taken them to Recinos. Recinos told the court that he had received the discovery the night before but that he did not have an opportunity to review all the transcripts. The court made no further comment.

The jury returned guilty verdicts for all counts and special verdicts that Recinos was armed with a firearm at the commission of the attempted murder and assault convictions. At sentencing, the State moved to vacate Recinos's two counts of first degree assault. The court vacated the two first degree assault convictions, explaining that the factual basis for the assault charges was the same as the factual basis for the attempted second degree murder charges. Also at sentencing, Recinos filed a pro se new trial motion and a relief from judgment motion. The court denied both motions and sentenced Recinos.[7] Recinos appeals.

## ANALYSIS

### I. 911 RECORDING

First, Recinos argues that the trial court erroneously admitted the 911 recording as an excited utterance because Teresa was not under the stress of a startling event. We disagree and

---

[7] A few weeks later, the trial court entered a corrected judgment and sentence.

hold the trial court did not err because Teresa's statements were properly admitted as an excited utterance.

## A. Standard of Review and Rules of Law

We review a trial court's determination that a hearsay exception applies under an abuse of discretion standard. *State v. Magers*, 164 Wn.2d 174, 187, 189 P.3d 126 (2008). Therefore, we will uphold the trial court's ruling unless we believe that no reasonable judge would have made the same ruling. *State v. Thomas*, 150 Wn.2d 821, 854, 83 P.3d 970 (2004). Although hearsay is generally inadmissible, ER 803(a)(2) provides that certain excited utterances may be admissible. *Magers*, 164 Wn.2d at 187. A statement qualifies as an excited utterance if "(1) a starting event occurred, (2) the declarant made the statement while under the stress or excitement of the event, and (3) the statement relates to the event." *Magers*, 164 Wn.2d at 187-88.

## B. Analysis

Here, the startling event was that a bloody Recinos arrived at Teresa's home and told her that he had shot the man Tiffany was with and that he had also T-boned Tiffany's car. On the 911 recording, Teresa's voice indicates stress and excitement. She sounds distraught, is talking very fast, sounds as if she had been crying, and is out of breath. She called 911 shortly after seeing that Recinos was bloody and hearing him say he shot a man and t-boned her daughter's car. Teresa's statements to the 911 operator describe Recinos's arrival at her home and what he said while there. Thus, the three part *Magers* test is met.

Recinos argues that Teresa's statements were not excited utterances because her voice indicated that she was relatively calm, her statements were in response to questions, and her statements were not spontaneous, relying on *State v. Doe*, 105 Wn.2d 889, 893-94, 719 P.2d 554

(1986) and *State v. Williamson*, 100 Wn. App. 248, 255-59, 996 P.2d 1097 (2000). Both cases are distinguishable. Although the *Doe* court mentioned, in passing, that the child was calm and made her statements in response to questions, neither of these facts were the basis of the court's holding. Instead, the court based its holding on the lapse of time, three days, between the event and the child's statements. *Doe*, 105 Wn.2d at 893-94. Recinos also cites *Williamson*, where the State sought to introduce statements from a kidnapping victim to her sister and to a police officer. *Williamson*, 100 Wn. App. at 251-52. The victim was kidnapped and threatened at gunpoint by her ex-husband, then escaped and drove to her sister's house. *Williamson*, 100 Wn. App. at 250-57.

*Doe* is clearly distinguishable because the court's concern in *Doe* was the lapse of time between the incident and the statements. Here, Teresa called 911 a short time after Recinos arrived at her home and told her about the shooting and the car accident involving Tiffany. On the recording, she says that she hurried to leave after Recinos arrived because the children were home alone. And although Recinos uses *Williamson* to argue that Teresa's statements are not excited utterances because they were not spontaneous, the *Williamson* court held that the victim's statements were spontaneous based on her emotional state, and the facts surrounding the kidnapping were admissible, even though some were presumably made in response to questions. Thus, *Doe* and *Williamson* do not support Recinos's argument.

Considering the circumstances surrounding Teresa's 911 call, Recinos fails to show the trial court abused its discretion in admitting the 911 recording as an excited utterance. Recinos's contrary argument fails.

## II. CUSTODIAL STATEMENTS

Recinos argues that the trial court should have suppressed his statements to Deputy Thompson and Detective Gundermann. The trial court did not err because all of Recinos's statements to Deputy Thompson and Detective Gundermann were spontaneous and voluntary and were not the product of interrogation or provocation.

When reviewing a trial court's conclusion of voluntariness, we determine "whether there is substantial evidence in the record from which the trial court could have found that the confession was voluntary by a preponderance of the evidence." *State v. Broadaway*, 133 Wn.2d 118, 129, 942 P.2d 363 (1997). Substantial evidence "exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Recinos first challenges finding of fact 8, which provides that "[t]he defendant then stated to Deputy Thompson that he had just found out that his wife was having an affair with a black guy." Clerk's Papers (CP) at 179. Deputy Thompson's testimony at the CrR 3.5 hearing supports this finding. Deputy Thompson testified that Recinos told him during the drive from the Moreau house to the accident scene that "he had found out that she was having an affair with a black man." 1 VRP at 16. And Deputy Thompson testified that Recinos's statement was not in response to anything Deputy Thompson had said. Thus, a sufficient quantity of evidence exists to persuade a fair-minded rational person of the truth of finding of fact 8.

Next, Recinos challenges the trial court's conclusion of law 2, which provides that "[t]he statements of the defendant were made sua sponte and were not the result of police interrogation." CP at 180. Here, the only question is whether Recinos's statements were the result of an interrogation. Wholly unsolicited statements and statements made in response to words not likely to solicit incriminating information are admissible even in the absence of *Miranda* warnings. *State v. Eldred*, 76 Wn.2d 443, 448, 457 P.2d 540 (1969). Interrogation includes "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Richmond*, 65 Wn. App. 541, 544, 828 P.2d 1180 (1992) (alteration in original) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). Brief, neutral, non-accusatory inquiries do not infringe on a defendant's privilege against self-incrimination. *State v. Lister*, 2 Wn. App. 737, 741, 469 P.2d 597, *review denied*, 78 Wn.2d 994 (1970).

Deputy Thompson testified that Recinos made two statements to him during the drive from the Moreau house to the accident scene: (1) Recinos asked if his wife was okay and (2) he told Deputy Thompson that "he had found out that she was having an affair with a black man." 1 VRP at 16. Deputy Thompson testified that neither of these statements came in response to anything Deputy Thompson said to or asked of Recinos. Deputy Thompson acted reasonably and did nothing to call for a response from Recinos. The statements were unsolicited and admissible even without *Miranda* warnings. *Eldred*, 76 Wn.2d at 448.

It is also clear that Detective Gundermann did not say any words or take any action that she should know were reasonably likely to elicit an incriminating response from Recinos. After Recinos arrived at the scene, Detective Gundermann approached Recinos in the police vehicle and asked him if he would like to give a taped statement. Recinos told her that he wanted to talk to an attorney first. Then, without any further question or statement from Detective Gundermann, Recinos asked her what he was being arrested for. Detective Gundermann told Recinos that there had been a collision and a shooting. Recinos responded that he did not know anything about a collision or a gun. Finally, after Detective Gundermann observed an injury to Recinos's right hand, she asked Recinos if he had any injuries to his hand. Recinos responded that he did not. Detective Gundermann asked Recinos only brief, neutral, and nonaccusatory inquiries that were not likely to elicit an incriminating response from him and those inquiries did not infringe on Recinos's privilege against self-incrimination. *Lister*, 2 Wn. App. at 741. Thus, Recinos's statements in response were admissible even without *Miranda* warnings.

We hold substantial evidence exists in the record to support the trial court's conclusion that the confession was spontaneous and voluntary by a preponderance of the evidence. Thus, the statements were admissible even without *Miranda* warnings.

### III. CUSTODIAL PHOTOGRAPHS

Recinos argues that the trial court erred by admitting three photographs showing him in the patrol car and handcuffed. Because the trial court properly weighed the probative value against their prejudicial effect, we hold the trial court did not abuse its discretion.

We review a trial court's evidentiary rulings for abuse of discretion. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). The party seeking to exclude evidence must demonstrate that the evidence's prejudicial effect substantially outweighs its probative value. ER 403.

Recinos objected to the photographs that showed him in handcuffs. The court noted that the photographs supported the State's theory that Recinos's right hand had a laceration that could have been caused by a firearm's slide action. The court also noted that the jury was going to hear from officers that Recinos had been arrested and handcuffed. Thus, the photograph was not unfairly prejudicial and the trial court did not abuse its discretion. Recinos also claims that the photographs' admission violated his constitutional rights to the presumption of innocence and a fair and impartial trial. Recinos cites three cases that are clearly distinguishable: one involving a defendant compelled to appear at trial in shackles, *State v. Finch*, 137 Wn.2d 792, 975 P.2d 967 (1999), one involving a defendant compelled to appear in prison garb, *Estelle v. Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976), and another that involved a trial held in a jailhouse setting. *State v. Jaime*, 168 Wn.2d 857, 233 P.3d 554 (2010). Recinos cites no authority that photographs depicting a defendant in handcuffs during his arrest, rather than at trial, implicates constitutional protections. Thus, the trial court did not abuse its discretion in admitting the photographs.

## IV. INEFFECTIVE ASSISTANCE

Recinos argues that his trial counsel was ineffective for failing to object when the trial court allowed the State to play Recinos's phone conversation recording from jail, because the court had not properly admitted the exhibit as evidence. Recinos argues this prejudiced him because the State used the recording to attack his credibility which was critical to his defense.

We hold that counsel was not deficient because there was no reasonable basis for excluding the recording and although not formally admitted, there was no irregularity about the way the exhibit was used at trial.

In his SAG, Recinos also asserts that trial counsel was ineffective for additional reasons: (1) because counsel violated CrR 4.5 by failing to conduct an omnibus hearing and (2) because counsel failed to ensure that Recinos received copies of redacted discovery. Recinos's assertions fail.

### A. Standard of Review and Rules of Law

Counsel is presumed to have acted competently unless defendant shows otherwise. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). To succeed on an ineffective assistance of counsel claim, the defendant must show that counsel's conduct was deficient and the defendant was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). If counsel's conduct can be characterized as legitimate trial strategy or tactics, a claim of ineffective assistance fails. *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996). The decision of when or whether to object is a classic example of trial tactics. And if a challenge to evidence's admissibility would have failed, a defendant cannot show that counsel was deficient for failing to object to it. *State v. Nichols*, 161 Wn.2d 1, 14-15, 162 P.3d 1122 (2007).

In order to show prejudice, a defendant must demonstrate that it is reasonably probable that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. If the ineffective assistance claim fails on one prong, we

No. 42599-8-II

do not address the other prong. *State v. Staten*, 60 Wn. App. 163, 171, 802 P.2d 1384, *review denied*, 117 Wn.2d 1011 (1991).

B. Analysis

1. <u>Recorded Jail Phone Call</u>

Recinos claims that his counsel was ineffective for failing to object to the State playing the jail phone call recording because the exhibit had not been formally admitted into evidence. The State called Corrections Officer Scollick to testify about how the jail recorded phone calls and to identify the recording. Later, during the State's cross-examination of Recinos, the State asked whether Recinos ever told anyone inconsistent stories about what happened the night of the incident, Recinos said he had not. The State then played the recording that Scollick had earlier identified, and asked:

> Mr. Recinos, would you agree with me that we just overheard you telling this individual, Jim—he asked you, I think, directly, Did you ever shoot at them? And you were heard saying no. And, Did you ever shoot at their car? And you were heard saying no?

6 VRP at 767-68. Recinos responded, "That's correct." The State then asks, "And yet a few moments ago you told this jury that you shot four to five times?" 6 VRP at 768. Recinos answered, "At the tires." 6 VRP at 768. Recinos did not object to the State playing the recording or the State's questions.

To prevail on an ineffective assistance claim, Recinos must first show deficient performance. *Strickland*, 466 U.S. at 687. But Recinos does not explain why any objection would have been sustained or why the recording was improper evidence. Recinos does not cite any cases or court rules as authority to support his argument that a simple failure to object to an

16

exhibit's formal admission amounts to deficient performance; therefore the issue is inadequately briefed. RAP 10.3(a)(6). Also, because Recinos bears the burden of demonstrating deficient performance, Recinos has clearly not met his burden on appeal. *Strickland*, 466 U.S. at 687.

We hold that Recinos has not shown that counsel's conduct was deficient. And even if counsel's performance was deficient, Recinos would also have to show that prejudice resulted. *Strickland*, 466 U.S. at 694. Recinos only asserts that the State used the recording to attack Recinos's credibility which was critical to his defense. But ER 607 provides that a witness's credibility may be attacked by any party. The State was entitled to use the recording to attack his credibility. We hold that Recinos has not established that his counsel was ineffective for failing to object to the admission of the recorded jail phone call.

2. Omnibus Hearing

Recinos asserts that his counsel was ineffective when he failed to obtain an omnibus hearing and when he failed to ensure that he received redacted copies of discovery. His assertions are without merit. First, more than one omnibus hearing was set.[8] But, even if we assumed that the omnibus hearing did not occur, it would not constitute ineffective assistance because trial counsel can waive an omnibus hearing in order to facilitate trial. As Division One of this court noted:

_____

[8] The first omnibus hearing was set for September 3, 2010 and both counsel agreed to continue the hearing to September 24. Our record does not contain any transcript from September 24; and the next transcript is a status conference on October 1, 2010. On October 1, the court continued the trial to November 16 and noted that an omnibus hearing would be set in two weeks. The next hearing in our record was October 15 and was a substitution of counsel hearing. The court appointed new counsel and continued the trial until January 18, 2011. It also noted that it would set an omnibus hearing. But again our record does not contain any further hearings until January 18, 2011, when the court granted yet another continuance. So it is unclear whether an omnibus hearing ever occurred.

CrR 4.5 [omnibus hearing] and 4.7 [discovery obligations] are procedural and not substantive as they merely allow for accelerated disclosure of information which ultimately must be revealed at trial and their purpose is to prevent last-minute surprise, trial disruption, and continuances and to encourage the early disposition of the cases through settlement. An attorney is impliedly authorized to waive procedural matters in order to facilitate a hearing or trial.

*State v. Wilson*, 29 Wn. App. 895, 901, 626 P.2d 998, *review denied*, 96 Wn.2d 1022 (1981) (citations omitted). Recinos fails to show that counsel was deficient. This ineffective assistance claims fails.

3. Redacted Discovery

Next, Recino asserts his attorney was ineffective for failing to provide him with redacted copies of discovery. This claim fails. Although Recinos apparently did not receive his own copy of the discovery until part way through trial, Recinos cannot show a reasonably probability that the proceeding's result would have been different had Recinos been given his own copy of redacted discovery earlier. Recinos's counsel told the court that Recinos had prior opportunity to review all the discovery before trial with the defense investigator, that several interns reviewed discovery with Recinos, and that counsel had numerous conversations with Recinos about the discovery. Thus, Recinos cannot show that having his own copy of the discovery would have changed the trial's result. And without showing prejudice, Recinos's ineffective assistance assertion fails. *Strickland*, 466 U.S. at 694; *Staten*, 60 Wn. App. at 171.

V. PROSECUTORIAL MISCONDUCT

In his SAG, Recinos asserts that the State committed misconduct when it commented on Recinos's partial silence three times at trial in violation of *Miranda*. Because overwhelming evidence supports Recinos's conviction and any rational trier of fact would have reached the

18

same conclusion, any alleged error touching on Recinos's right to postarrest silence was harmless beyond a reasonable doubt and does not warrant reversal.[9]

### A. Standard of Review and Rules of Law

During its case in chief, the State may not use evidence of a defendant's silence either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). When a defendant's silence is raised at trial, we consider whether the prosecutor manifestly intended the remarks to be a comment on that right. *State v. Burke*, 163 Wn.2d 204, 216, 181 P.3d 1 (2008). "[C]omment" means the State uses the accused's silence to suggest to the jury that the refusal to talk is an admission of guilt. *Lewis*, 130 Wn.2d at 707. A mere reference to silence which is a not a "comment" on the silence is not reversible error absent a showing of prejudice. *See Lewis*, 130 Wn.2d at 706-07.

Eliciting testimony about and commenting on a suspect's postarrest silence or partial silence is constitutional error and subject to our stringent constitutional harmless error standard. *State v. Easter*, 130 Wn.2d 228, 236-37, 242, 922 P.2d 1285 (1996). Under this standard, we presume constitutional errors are harmful and reverse and remand for a new trial unless the State meets the heavy burden of establishing that the constitutional error was harmless beyond a reasonable doubt. *Easter*, 130 Wn.2d at 242. A constitutional error is harmless beyond a reasonable doubt only if the evidence is so overwhelming that any rational trier of fact would necessarily have found the defendant guilty. *Easter*, 130 Wn.2d at 242.

---

[9] In his SAG, Recinos also asserts that trial counsel was ineffective for failing to object to this alleged prosecutorial misconduct. Because we hold that the prosecutor did not commit misconduct, Recinos's ineffective assistance claim necessarily fails.

B. Analysis

First, Recinos asserts that the prosecutor violated his right to remain silent when he improperly asked Hayes, Recinos's fellow cell mate, whether Recinos told Hayes that he believed his wife had been kidnapped. Next, Recinos asserts the prosecutor improperly questioned him regarding why Recinos had not previously told anyone about his intention to shoot at the car's tires. He asserts that the question, "And yet you chose not to tell anyone about this until today?" also violated his right to remain silent. 6 VRP at 784. And Recinos asserts that the prosecutor made improper argument in rebuttal closing by commenting on these things and on Recinos's belief that his wife had been kidnapped again.

Here, we will assume, without deciding, that the prosecutor's statements touched on Recinos's partial postarrest silence and apply the constitutional harmless error standard. Thus we presume reversible error unless the evidence is so overwhelming that any rational trier of fact would necessarily have found Recinos guilty. *See Easter*, 130 Wn.2d at 242. Such overwhelming evidence is present here.

Specifically, Tiffany testified that she saw Recinos driving the minivan, appearing angry, that bullets immediately hit her car, and that the minivan collided with her car multiple times. DeVone testified that after the multi-car collision in the intersection, that Recinos approached him on foot, pointed a gun at his head, cocked it, and told him that he should kill them both. Recinos then hit him in the head with the gun and walked away. Teresa also testified that Recinos arrived at her house bloody and told her that he had shot at and T-boned Tiffany's car. And Hayes testified that Recinos told him in jail that he tried to kill his wife because she was cheating on him. In light of this overwhelming evidence demonstrating Recinos's guilt, we hold

that any rational trier of fact would necessarily have found Recinos guilty of two counts of attempted second degree murder, one count of vehicular assault, and one count of failure to remain at the scene of an accident. Accordingly, any error related to an improper comment on Recinos's postarrest silence was harmless beyond a reasonable doubt.

## VI. SPEEDY TRIAL

In his SAG, Recinos asserts that the trial court violated his constitutional rights to a speedy trial five times when it granted continuances on July 2, October 1, October 15, 2010, and January 18 and February 7, 2011. Recinos's assertions fail.

### A. Standard of Review

Both the United States Constitution and the Washington Constitution provide a criminal defendant with the right to a speedy public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Our state constitution "requires a method of analysis substantially the same as the federal Sixth Amendment analysis and does not afford a defendant greater speedy trial rights." *State v. Iniguez*, 167 Wn.2d 273, 290, 217 P.3d 768 (2009). We review de novo constitutional speedy trial claims. *State v. Ollivier*, No. 86633-3, slip. op. at 9 (Wash. Oct. 31, 2013); *Iniguez*, 167 Wn.2d at 280-81.

### B. Analysis

A defendant's constitutional rights to a speedy trial attach when a charge is filed or an arrest is made, whichever occurs first. *State v. Corrado*, 94 Wn. App. 228, 232, 972 P.2d 515, *review denied*, 138 Wn.2d 1011 (1999). Some pretrial delay is often "inevitable and wholly justifiable," *Doggett v. United States*, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992), and any "inquiry into a speedy trial claim necessitates a functional analysis of the right in

the particular context of the case." *Ollivier*, No. 86633-3, slip op. at 10; *Barker v. Wingo*, 407 U.S. 514, 522, 533, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) (delay was "well over five years").[10] We use the *Barker* test to determine whether the trial court violated the defendant's constitutional rights. *Ollivier*, No. 86633-3, slip op. at 9.

But to trigger the *Barker* analysis, the defendant must first demonstrate that the "interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Ollivier*, No. 86633-3, slip op. at 10 (quoting *Doggett*, 505 U.S. at 651-52). We consider the duration of pretrial custody, the charges' complexity, and the extent to which a case involves a reliance on eyewitness testimony. *Iniguez*, 167 Wn.2d at 292 (citing *Barker*, 407 U.S. at 531). In *Iniguez*, our Supreme Court found "presumptive[] prejudic[e]" based upon a more than eight-month delay. 167 Wn.2d at 291-92. The court found it important that (1) the defendant had remained in custody throughout this period, (2) the charges against him were not complex, and (3) such a lengthy delay "could result in witnesses becoming unavailable or their memories fading," thus impairing his defense. *Iniguez*, 167 Wn.2d at 292.

Here, as in *Iniguez*, Recinos remained in custody pending trial, and the length of the delay was similar. Trial was continued several times over Iniguez's pro se speedy trial objections and finally began February 8, 2006. *Iniguez*, 167 Wn.2d at 278-79. The delay between arrest and trial was over eight months. *Iniguez*, 167 Wn.2d at 292. Here, the State filed its first charges against Recinos on February 25, 2010, and trial was originally scheduled for July

---

[10] As first articulated by the United States Supreme Court in *Barker*, we consider: (1) the length of pretrial delay, (2) the reason for delay, (3) the defendant's assertion of his or her right, and (4) prejudice to the defendant. 407 U.S. at 530.

6, 2010. After several continuances over his pro se objections, Recinos's trial ultimately began February 28, 2011. The delay between Recinos's arrest and trial was 12 months.

But unlike Iniguez who faced four counts of first degree robbery,[11] the charges against Recinos were quite complex. The initial charges against Recinos involved three victims and included two counts of attempted first degree murder, three counts of first degree assault, three counts of vehicular assault, and one count of failure to remain at the accident scene. And although the State's case against Recinos rested in part on eyewitness testimony, it also rested largely on forensic evidence from the vehicles involved in the collision and forensic evidence regarding the gun involved. And unlike in *Iniguez*, Recinos does not point to any danger that the witnesses' memories would have faded or did fade due to the continuances or that any witnesses became unavailable due to the delay. Recinos has not established that the time between his arrest and trial was presumptively prejudicial. Thus, it appears that Recinos has not met the threshold requirement for bringing his constitutional speedy trial claim and we do not need to address the four-pronged *Barker* test.

## VII. CUMULATIVE ERROR

Recinos argues that cumulative error deprived him of a fair trial. Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of trial errors effectively denies the defendant's right to a fair trial, even if each error alone would be harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied*, 551 U.S. 1137 (2007). But cumulative error does not apply where there are no errors or where the errors are few and

---

[11] *Iniguez*, 167 Wn.2d at 277.

23

have little or no effect on the trial's outcome. *Weber*, 159 Wn.2d at 279. Because we find no error, cumulative error cannot apply.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, A.C.J.

We concur:

Penoyar, J.

Bjorgen, J.