**FILED**
**SEPTEMBER 15, 2016**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33210-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUAN CARLOS ARANDA-SARABIA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — The trial court, after a jury verdict, convicted Juan Carlos

Aranda-Sarabia of attempted murder in the first degree, among other crimes. On appeal,

Aranda challenges both his conviction and a portion of his sentence. During trial, police

officer Ben Majetich testified to an eye witnesses' identification of Aranda as the shooter

without the eye witness testifying at trial. Aranda did not then object. After the jury

found Aranda guilty, the trial court found that he lacked the present or future ability to

pay legal financial obligations. The court, nevertheless, imposed mandatory financial

obligations of a deoxyribonucleic acid (DNA) testing fee, restitution, and a victim fee.

Aranda argues before us that his trial counsel was ineffective for failing to object to

Majetich's testimony and that the trial court violated substantive due process by imposing the DNA fee. We reject Aranda's arguments and affirm his conviction and sentence.

FACTS

On February 12, 2013, Juan Carlos Aranda-Sarabia gathered his family and left the family's Burbank residence for Pasco. At trial, Aranda testified that he left the Burbank home to flee from men who threatened him and his family. After separating from his family, Aranda approached 226 Oregon Street, in Pasco. Aranda testified that he believed the structure at the address was a hotel and that his family was resting there. The structure was an apartment complex, however. Aranda knocked on apartment doors seeking to find the hotel office.

Juan Carlos Aranda-Sarabia eventually knocked on the outside door of apartment one, in which Alfredo Mejia-Leyva lived with Angelica Vibanco and her children. Mejia had just completed showering and answered the knock. Mejia opened the door, and Aranda proclaimed he was looking for someone else and made a mistake by rapping on the door. Mejia closed the door.

Juan Carlos Aranda-Sarabia knocked on the door a second time. Angelica Vibanco opened the door this time. Aranda entered and pointed a shotgun at Alfredo Mejia-Leyva's chest. Mejia instinctually pushed the shotgun from his chest, but the gun fired and pumped buckshot into his stomach.

2

Angela Mazon-Flores, who lived in apartment three of the complex, and Curtis Gresser, who lived in apartment five, heard a gunshot. Mazon then saw Juan Carlos Aranda-Sarabia with a gun. Gresser saw Aranda with a gun wrapped in his sweater.

We do not know who summoned law enforcement, but Pasco police officers arrived within minutes. Officers found Juan Carlos Aranda-Sarabia in bushes near Alfredo Mejia-Leyva's apartment and placed him in handcuffs. When handcuffing Aranda, police officers ordered him to kneel. When Officer Trever Sweeney approached Aranda to escort him to a police cruiser, Sweeney observed that Aranda had knelt on a shotgun inside his sweater. Sweeney confiscated the shotgun.

Pasco Police Captain Ben Majetich went to apartment one. Angelica Vibanco opened the door a crack. Vibanco talked to someone on her cellphone. She shook and cried. Vibanco opened the door for Majetich to enter and Majetich discovered Alfredo Mejia-Leyva lying on the floor of his apartment in a puddle of his own blood.

Captain Ben Majetich escorted Angelica Vibanco outside to the patrol car, in which Juan Carlos Aranda-Sarabia sat. Majetich wanted to ensure that officers had arrested the assailant and that the culprit was not endangering others. Majetich directed Vibanco to look at Aranda, and Captain Majetich asked Vibanco: "'Is this the right guy?'" Report of Proceedings (RP) at 206. Vibanco replied: "'Yeah. Yeah. That's him.'" RP at 207.

3

Emergency personnel rushed Alfredo Mejia-Leyva to the local hospital, where he was air evacuated to Harborview Medical Center in Seattle. Dr. Fermin Godinez, the emergency room doctor who first treated Mejia, characterized Mejia's wounds as "potentially lethal." RP at 237. Mejia required one year to recover. Washington State Patrol Crime Laboratory scientist, Beau Baggenstoss, tested the shotgun and found Aranda's DNA on the shotgun.

Angelica Vibanco, at an unidentified time before trial, relocated to California.

PROCEDURE

On February 14, 2013, the State of Washington filed charges against Juan Carlos Aranda-Sarabia for first degree assault. The State later amended the charges to include a count of attempted first degree murder. The State sought a firearm enhancement with each charge.

On September 5, 2014, the trial court signed a subpoena compelling Angelica Gomez Vibanco to appear and testify at trial for an October 2014 trial date. The 2014 trial date was postponed.

On February 17, 2015, the State, in a trial brief, wrote: "[a]t the current time [Angelica Vibanco] is not cooperative with the prosecution." Clerk's Papers (CP) at 124. The brief also asserted that an officer should be allowed to testify to Vibanco's identification of Juan Carlos Aranda-Sarabia under two exceptions to the hearsay

4

evidentiary prohibition: statements of identification and excited utterances. On February 18, 2015, the trial began.

During trial, Pasco Police Captain Ben Majetich testified about his conversation with Angelica Vibanco, Alfredo Mejia-Leyva's temporary roommate, immediately after the shooting. Majetich declared:

> Angelica Vibanco. She—she—initially, I remember this specifically, she initially had just like cracked open the door enough where I could see her, and I think I got the impression that she just wanted to verify I was the police, and she had a cell phone to her ear and was, you know, shaking, crying and you know how you sob, you get the quiver in your voice? It's because she was talking to somebody on the phone and wasn't talking directly to me.
>
> Then once I believe she identified me as a police officer she opened the door wider. When she opened the door initially beside her crying and, you know, talking on the phone, her two children just—I don't know what they were saying but just crying and bawling and, you know, screaming.
>
> They opened the door wider, and at that time I saw an adult male right there on the inside of the door laying on the living room floor. . . .
>
> . . . .
>
> Q. Okay, and did you ask this woman to take a look at this person who was in custody out in the yard?
>
> A. I—I first asked her—I said, "Who shot—you know, who shot him?" She responded, "Some guy." . . .
>
> The defendant, by that time he had been walked out to a patrol car here (indicating). So, it just, you know, is feet. Ten, twenty feet maybe. I asked her if she would step out and look at him, "Is this the right guy?" because my main concern, yeah, identity for the case. That's big obviously, but I just wanted to make sure we had the guy that was responsible and we do not have somebody else running around.
>
> . . . .
>
> Q. All right, and while you're asking her to do this, is she still in the same condition you describe her earlier?

A. Oh, yeah and very hesitant. As a matter of fact, I had to coach her outside of the apartment, and we later learned why that was, but I had to coach her out of the apartment. She just peeked out enough to peek around the corner, and then she immediately ducked back and said, "Yeah. Yeah. That's him." So, we were confident we had the right guy.

Q. Thank you.

A. At this point, her reaction or what she said obviously, fear, but yeah, we had him.

Q. So, her demeanor when she saw him looked afraid to you?

A. Oh, sure. Yeah. Even with all—by this time, we had a lot of cops and stuff, but she was still afraid.

RP at 204-07.

On cross-examination of Pasco Detective Scott Warren, defense counsel elicited testimony that Angelica Vibanco "gave a couple different versions of what happened that day." RP at 512. Warren did not identify the nature of the different versions.

The jury found Juan Carlos Aranda-Sarabia guilty of both assault in the first degree and attempted murder in the first degree. The trial court ruled that the charges merged and sentenced Aranda only for the attempted murder in the first degree charge with a firearm enhancement.

At sentencing, the trial court struck all nonmandatory legal financial obligations on the basis that Juan Carlos Aranda-Sarabia lacked the present or future ability to pay the obligations. The court imposed restitution, a victim assessment fee, and the DNA collection fee of $100. Aranda did not object, at sentencing, to the imposition of the DNA collection fee.

6

## LAW AND ANALYSIS

### Ben Majetich Testimony

Juan Carlos Aranda-Sarabia complains on appeal that his trial counsel should have

and failed to object to Captain Ben Majetich's testimony that Angelica Vibanco identified

Aranda as the shooter of Alfredo Mejia-Leyva. We need to identify the rules or

constitutional provisions on which Aranda relies when assigning this error. In his first

three assignments of error, Aranda declares:

> 1. The trial court erred in admitting hearsay statements by the victim's roommate, Angelica Gomez Vibanco.
> 2. Mr. Aranda was denied effective assistance of counsel by his counsel's failure to object to the admission of hearsay statements that violated his constitutional right of confrontation.
> 3. Mr. Aranda was denied a fair trial.

Br. of Appellant at 1 (footnote omitted). In his first two issues pertaining to his

assignments of error, Aranda writes:

> 1. Did the admission of hearsay statements by the victim's roommate, Angelica Gomez Vibanco, violate Mr. Aranda's confrontation rights under the Sixth Amendment to the United States Constitution?
> 2. Was Mr. Aranda denied effective assistance of counsel by his counsel's failure to object to the admission of hearsay statements that violated his confrontation rights?

Br. of Appellant at 1. Finally, in the headline to his brief's argument of law, Aranda

summarizes:

> Mr. Aranda was denied a fair trial and effective assistance of counsel when his counsel failed to object to the admission of damaging hearsay

7

statements of the victim's roommate, Angelica Gomez Vibanco, which violated the confrontation clause under the Sixth Amendment to the United States Constitution and Article I, section 22 of the Washington Constitution.

Br. of Appellant at 7. After reviewing the assignments of error, issues pertaining to the assignments of error, and the appellant's brief, we conclude that Juan Carlos Aranda-Sarabia asserts the hearsay evidentiary rule, the confrontation clauses of the Sixth Amendment to the United States Constitution and article I, section 22 of the state constitution, and the constitutional right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 22 of the state constitution.

Juan Carlos Aranda-Sarabia did not object at trial to the testimony of Ben Majetich. Therefore, we must determine what, if any, argument Aranda may pursue on appeal.

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

> **(a) Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

RAP 2.5. No procedural principle is more familiar than that a right of any sort may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731,

113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944).

RAP 2.5(a) affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d at 749-50 (2013); *State v. Scott*, 110 Wn.2d 682, 685-88, 757 P.2d 492 (1998).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a)(3) allows an appellant to raise for the first time "manifest error affecting a constitutional

9

right," an exception on which a convicted appellant commonly relies. Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice to the accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d at 686-87. Prohibiting all constitutional errors from being raised for the first time on appeal would result in unjust imprisonment. 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5 author's cmt. 6, at 218 (8th ed. 2014). On the other hand, "permitting *every possible* constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials and is wasteful of the limited resources of prosecutors, public defenders and courts." *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992).

Juan Carlos Aranda-Sarabia's assignment of error based on ER 801 and 802, the hearsay bar to testimony, is by definition based on a court rule, not a constitutional provision. Therefore, we decline to address whether Ben Majetich's testimony violates the hearsay rule. Pursuant to ER 103(a)(1):

> error may not be predicated upon a ruling which admits or excludes
> evidence unless . . . a timely objection or motion to strike is made, stating
> the specific ground of objection.

We move to Juan Carlos Aranda-Sarabia's constitutional challenges. Under the Sixth Amendment's confrontation clause, "[i]n all criminal prosecutions, the accused

10

shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Under the Washington Constitution, article 1, section 22, an accused holds the right "to meet the witnesses against him face to face." Juan Carlos Aranda-Sarabia claims that his confrontation clause assigned errors present manifest constitutional error and are thus reviewable under RAP 2.5(a)(3).

Although some constitutional errors may be asserted for the first time on appeal, both the United States Supreme Court and this court have held that confrontation clause errors, because of the uniqueness of the clause, may never be asserted for the first time on review. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 326-27, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), the United States Supreme Court declared that the defendant always has the burden of raising his federal confrontation clause objection at trial. The Court reasoned:

> It is common to require a defendant to exercise his rights under the Compulsory Process Clause in advance of trial, announcing his intent to present certain witnesses. There is no conceivable reason why he cannot similarly be compelled to exercise his Confrontation Clause rights before trial.

*Melendez-Diaz*, 557 U.S. at 327 (internal citations omitted).

In *State v. O'Cain*, 169 Wn. App. 228, 279 P.3d 926 (2012), this court, citing *Melendez-Diaz*, held that a defendant must raise a confrontation clause claim at or before trial or lose the benefit of the right both under the United States and the state

11

constitutions. James O'Cain was convicted of one count of assault in the second degree, one count of assault in the fourth degree, and one count of felony harassment, based in part on out-of-court statements uttered by the victim, Sheila Robinson, to medical personnel who treated Robinson for her injuries. O'Cain contended on appeal that his convictions must be reversed because the admission of Robinson's statements violated his right to confrontation under both the state and federal constitutions. We held that, because O'Cain did not assert his confrontation clause objection at or before trial, he could not obtain appellate relief on that claim, despite RAP 2.5(a)(3).

In a thoroughly reasoned and historically chronicled opinion, the *O'Cain* court noted that the defendant must assert the confrontation clause right at trial so that the prosecution may decide what steps to take to introduce the desired evidence. The obligation of the defendant to assert the right at trial is "part and parcel of the very right itself." 169 Wn. App. at 238. We reasoned:

> Requiring the defendant to assert the confrontation right at trial is also consistent with other Sixth Amendment jurisprudence. Indeed, were this not the defendant's burden, the trial judge would be placed in the position of sua sponte interposing confrontation objections on the defendant's behalf—or risk knowingly presiding over a trial headed for apparent reversal on appeal. Such a state of affairs is obviously untenable.

*O'Cain*, 169 Wn. App. at 243.

The *O'Cain* court noted that James O'Cain failed to cite any authority to expand the protection afforded under the state constitution confrontation clause from that

12

afforded by the United States Constitution in terms of the requirement of asserting the right at trial. The reasons that attended to the requirement under federal law attached to the state constitution. A defendant should not be permitted to stay silent at trial, bet on a verdict in his favor, and then raise his state confrontation claim on appeal. Gaming the system in this manner is of no less concern when it is a state right that is asserted, as opposed to a federal right. The wording of the Washington provision supported our conclusion. Article I, section 22 refers to the defendant's right "to meet the witnesses against him face to face." Those words lend no credence to the notion that a defendant may choose not to confront the witness at trial and then seek a new trial based on the absence of confrontation.

We move to Juan Carlos Aranda-Sarabia's ineffective assistance of counsel argument. This assignment of error asserts a constitutional error. One might argue that Aranda should not be able to assert indirectly that his counsel committed error by failing to assert the confrontation clause at trial by directly raising ineffective assistance of counsel. This argument is bolstered by the recognition that the determination to assert the confrontation clause at trial should be left to the discretion of the attorney. *State v. O'Cain*, 169 Wn. App. at 244-45 (2012). We do not address this question, nor do we address whether Aranda presents a manifest constitutional error. Since Aranda does not establish prejudice, we reject his ineffective assistance of counsel assignment of error.

13

A claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014). If one prong of the test fails, we need not address the remaining prong. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). This is a mixed question of law and fact, reviewed de novo. *Strickland v. Washington*, 466 U.S. at 698.

For the deficiency prong, this court gives great deference to trial counsel's performance and begins the analysis with a strong presumption that counsel was effective. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015). Trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1, 16, 177 P.3d 1127 (2007). Deficient performance is performance that fell below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The appellant bears the burden to prove ineffective assistance of counsel. *State v. McFarland*, 127 Wn.2d at 335.

> The decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.

14

*State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989).

Under *Strickland*, for the prejudice prong, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 694. But within the context of manifest constitutional error, the standard in Washington is more stringent, omitting *Strickland*'s "reasonable probability" language. *State v. Contreras*, 92 Wn. App. 307, 312, 966 P.2d 915 (1998). Thus, a defendant "bears the burden of showing, based on the record developed in the trial court, that the result of the proceeding *would have been different* but for counsel's deficient representation." *State v. McFarland*, 127 Wn.2d at 337 (1995) (emphasis added).

The State presented overwhelming evidence of Juan Carlos Aranda-Sarabia's guilt, including the victim's identification of Aranda and his DNA on the shotgun. Aranda conceded that he was present at the scene of the crime before, during, and after the shooting. Multiple witnesses saw him with an object they identified as a gun.

15

DNA Collection Fee

Juan Carlos Aranda-Sarabia contends the $100 DNA fee violates substantive due process as applied to indigent defendants. The State responds that the fee does not violate substantive due process and that the fee is mandatory. We decline to address the merits of this assignment of error.

Juan Carlos Aranda-Sarabia did not contend, during sentencing, that the imposition of the mandatory DNA collection fee without inquiry into his ability to pay violates substantive due process principles. RCW 43.43.754 demands a biological sample, for purposes of DNA identification analysis, from an adult convicted of a felony. In turn, RCW 43.43.7541 imposes a $100 mandatory fee on the adult convicted of a felony to defray the cost of the collection of the sample. The latter statute reads, in relevant part:

> Every sentence imposed for a crime specified in RCW 43.43.754 must include a fee of one hundred dollars. The fee is a court-ordered legal financial obligation as defined in RCW 9.94A.030 and other applicable law. For a sentence imposed under chapter 9.94A RCW, the fee is payable by the offender after payment of all other legal financial obligations included in the sentence has been completed. For all other sentences, the fee is payable by the offender in the same manner as other assessments imposed. . . .

This court recently addressed whether it should entertain a constitutional challenge to the payment of the DNA collection fee when the defendant failed to raise the challenge

16

before the trial court. In *State v. Stoddard*, 192 Wn. App. 222, 366 P.3d 474 (2016), we held that we would not review the challenge if the record does not show the financial condition of the appellant. RAP 2.5(a)(3) allows an appellant to raise for the first time "manifest error affecting a constitutional right." Nevertheless, in order for an issue to be "manifest" under RAP 2.5, the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d at 333 (1995); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

Juan Carlos Aranda-Sarabia's appeal echoes Gary Stoddard's challenge. Like Stoddard, Aranda's contentions assume his poverty. The record, however, contains no information that he cannot afford to pay the $100 collection fee. The trial court ruled Aranda to be indigent for purposes of hiring appellate counsel. Nevertheless, the cost of a criminal charge's defense exponentially exceeds $100. Therefore, one may be able to afford payment of $100, but not afford defense counsel.

## CONCLUSION

We affirm the conviction and sentence of Juan Carlos Aranda-Sarabia. We deny the State costs on appeal.

A majority of the panel has determined this opinion will not be printed in the

17

No. 33210-1-III
*State v. Aranda-Sarabia*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Fearing, C.J.

WE CONCUR:

Lawrence-Berrey, J.

Pennell, J.